ABBEY'S TRANSPORTATION
SERVICES, INC., Petitioner,
Cross–Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,
Cross–Petitioner.

Nos. 443, 579, Dockets 87–4096, 87–4114.

United States Court of Appeals,
Second Circuit.

Argued Dec. 16, 1987.
Decided Jan. 25, 1988.

Jeffrey M. Bernbach, New York City, for petitioner, cross-respondent.

Dennis P. Walsh, Washington, D.C. (Rosemary Collyer, John E. Higgins, Jr., Robert E. Allen, Aileen A. Armstrong, Elliott Moore, John Truesdale, Linda Dreeben, on the brief), for respondent, cross-petitioner.

Before KAUFMAN, MESKILL and KEARSE, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The arduous task of parsing legitimate from unlawful motives in employer discharges of union activists has plagued both the courts and the National Labor Relations Board (hereafter "the Board") since the enactment of the National Labor Relations Act (hereafter "the Act") in 1935. Because of the rising number of unfair labor practice charges during union organizing drives, unlawful discharges currently are a pressing concern in fulfilling the Act's mandate to protect employees' rights to organize.

Today, the chances are one in twenty that a union supporter will be terminated during a union organizing drive. Weiler, *Promises to Keep: Securing Workers' Rights to Self–Organization Under the NLRA*, 96 Harv.L.Rev. 1769, 1781 (1983). This widespread pattern of intimidation threatens the laboratory conditions requisite to free and fair election processes. Employees are certain to be discouraged from supporting a union if they reasonably believe it will cost them their jobs. Thus, the Board and the courts must carefully scrutinize dismissals during union organizing drives.

In the case at hand, two union activists, Hernan Orrego and William Restrepo, both senior employees, were discharged within thirty minutes of each other on the day the union formally petitioned for an election. Although Abbey's Transportation Services, Inc. (hereafter "the company") denies any knowledge of their union activity and proffers alternative bases for the terminations, the Board found that its claims were pretextual. Specifically, the Board, in an opinion reported at 284 NLRB No. 81, found that the company violated Section 8(a)(1) and (3) of the Act, 29 U.S.C. §§ 158(a)(1) and (3) (1982),[1] by discharging Orrego and Restrepo. The Board also charged violations of Section 8(a)(1) because the company deferred a scheduled wage increase during the campaign and interrogated employees on their union sympathies. The company now petitions for review of the order, and the Board has filed a cross-application for enforcement.

The company operates a limousine and charter bus service, providing transportation throughout the eastern United States and Canada. It primarily serves LaGuardia, Kennedy and Newark Airports through its limousine operation. The incident that sparked the dispute at issue with regard to William Restrepo was a charter bus trip to Washington, D.C., ferrying participants to a demonstration celebrating the 20th anniversary of Martin Luther King, Jr.'s famous 1963 civil rights march. A week after the August 27, 1983, excursion, Restrepo received his paycheck and complained to other drivers that he was short-

---

**1.** Section 8(a)(1) makes it an unfair labor practice to interfere with, restrain, or coerce the exercise of the right to join or refuse to join a union. Section 8(a)(3) prohibits discrimination in hiring or granting tenure to encourage or discourage membership in a union.

changed for the trip. He claimed that he had received only 20% of the price of the charter rather than a combined payment of 20%, his regular salary, and a $20 bonus.

On September 16th, Lester Feinberg, the company's president, called Restrepo into the office Feinberg shared with his son, Steven, the executive vice president. In the ensuing discussion, Restrepo called the elder Feinberg a "son of a bitch" and accused him of stealing his money. Feinberg's son, who witnessed the conversation, testified before the administrative law judge (hereafter "ALJ") the elder Feinberg asked for an apology. Restrepo denied the latter two assertions, contending that he called Lester Feinberg a "son of a bitch" only after the president had employed the same term. Except for an attempt by Feinberg's secretary to explain the pay calculation on September 17th, Restrepo did not hear about this incident again for a full week.

Meanwhile, Restrepo and his co-workers sought a more permanent solution to their wage grievances. On September 8th, Restrepo and Orrego met with officials of the New York Hotel and Motel Trades Council, AFL–CIO (hereafter "the union"), to inquire about joining the union. They were given blank union authorization cards for their co-workers to sign. Once a union receives cards from 30% of the company's employees, it can usually petition the Board to conduct an election. Between September 8th and 15th, the two obtained the signatures of 31 of the drivers. Although there is an on-going dispute whether the total number of employees was 55 or 63 and thus whether a majority of employees had joined the union, the card count clearly exceeded the showing of interest required for an election.

After returning the signed cards to the union's office, Restrepo and Orrego informed most of the drivers that there would be a meeting at the union's headquarters on September 19th. Twenty-two drivers, including Restrepo and Orrego, attended this meeting at which union representatives discussed the benefits of unionization and explained the process of obtaining union recognition. Four days later, on September 23rd, the union filed its petition with the Board for a representation election.

Also on September 23rd, prior to receiving official notification of the union's petition, the company announced a meeting of most of its drivers for that evening. Thirty minutes before the session, Lester Feinberg called Orrego, an employee of 4½ years, into his office and dismissed him. Feinberg told Orrego he was terminated for refusing a job two days earlier to pick up passengers at Kennedy Airport. Although Orrego attempted to explain the incident, Feinberg told him pointedly that he did not want to hear his version.

Immediately after Orrego left Feinberg's office, Feinberg summoned Restrepo, an 8½ year veteran and one of the most senior drivers, and ordered him to leave too. According to Feinberg's son's account of the incident, the elder Feinberg claimed that Restrepo had failed to apologize for his outburst the week before and that he had complained about his pay to drivers from other companies. The "captive audience" meeting was held immediately thereafter. Although that meeting, unlike another session in October, did not result in a violation of Section 8(a)(1), it appears to have been designed to cultivate favor among the employees. At the meeting, Feinberg reminded employees of their eligibility for health benefits and resolved an overtime pay dispute favorably for the workers.

On September 29th, the company received official notification of the election petition and launched a forceful campaign to dissuade its drivers from voting for the union. The company distributed anti-union letters to the employees in their paychecks, and the Feinbergs explained these letters to those who questioned them. In October, the company held another meeting for its drivers. At that meeting, Lester Feinberg informed the drivers that he had to defer scheduled raises until after the union election.

The union lost the Board-conducted election by a vote of 14 to 33, with 5 ballots challenged by either the company or the

union. The "challenged" ballots could not affect the results of the election. Thereafter, the union filed objections to the election, accusing the company of unlawfully discharging Restrepo and Orrego, laying off another employee, Fiorvante Ventanihla, for union activities and refusing to recall him, deferring scheduled wage increases until after the election, threatening employees that the company would close if they voted for the union, insisting that no worker could vote unless he had presented valid immigration papers, and keeping the union's meetings and activities under surveillance. The union charged that the company's conduct crippled its organizing efforts and damaged the laboratory conditions necessary to an election.

In preparing a response to these objections, Steve Feinberg brought most of the drivers to the office of the company's lawyer, Jeffrey Bernbach. In addition to other queries, Bernbach asked each of them, in the presence of Steve Feinberg, whether they had signed authorization cards. The greater number admitted they had, and these answers were included in the affidavits prepared by the company for the drivers. The union also objected to this incident.

On March 28, 1985, the ALJ dismissed all the unfair labor practice charges except two. He found that deferral of scheduled wage increases and interrogation of employees concerning their union affiliation violated Section 8(a)(1). He concluded, however, that these violations were insufficient to change the outcome of the election. He also determined that the employer had "ample cause" to dismiss Restrepo and Orrego. The Board remanded the case to the ALJ to make further findings of credibility on several issues, none of which concerns the current petition to this court. The ALJ issued a supplemental decision on April 10, 1986, providing the necessary conclusions.

On June 30, 1987, the Board affirmed the ALJ's two findings of 8(a)(1) violations. Reversing the ALJ's determination, however, the Board found that the company violated Section 8(a)(1) and (3) by discharging Restrepo and Orrego for their

union activities. The Board's order required the company to offer the two workers reinstatement and to compensate them for lost earnings, with interest. The order also required the company to remove all references to the discharges of Restrepo and Orrego from its files and to post an appropriate notice. The Board in this case refused to issue a *Gissel* order requiring the employer to bargain with the union. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Although the union had a majority of cards (31) for a bargaining unit of 55, the Board found that the General Counsel had failed to prove that the unit was in fact only 55, and not 63 as the employer maintained. In a companion case, however, the Board found that the employer's conduct warranted setting aside the 1983 election and ordered a new one.

Petitioner challenges only the Board's determination that Restrepo and Orrego were unlawfully discharged, choosing not to contest the holding that Section 8(a)(1) violations occurred during and after the election. Nevertheless, because the other violations implicate important principles of law and impact upon our discussion of the firings, we briefly recount them here.

■ An employer violates the Act when he withholds a previously scheduled wage increase after a union commences a representation campaign. *GAF Corporation v. NLRB*, 488 F.2d 306, 308–309 (2d Cir.1973); *NLRB v. Hendel Mfg. Co., Inc.*, 483 F.2d 350, 352–53 (2d Cir.1973). Thus, Feinberg's announcement violated Section 8(a)(1).

■ Far more disturbing than the wage deferral, however, were the events that occurred after the election. Although an employer may ask narrowly-tailored and relevant questions of employees when defending against objections or unfair labor practice charges, he cannot ask employees whether they had signed union authorization cards when the question was so immaterial to the issue. Moreover, Bernbach should have known the clearly coercive effect of this interrogation. In his reply brief, Bernbach asserts two justifications

for his conduct: the questioning occurred after the election and he elicited affirmations of union support to demonstrate that even the "converted" believed the company had not engaged in improper conduct. He describes these infractions as "technical in nature." We are not so easily comforted. It is axiomatic that the rights enshrined in the Act do not evaporate after an election. Bernbach offers no showing that the question was relevant to any dispute before the Board. It is particularly distressing that a member of the bar would actively engage in conduct so clearly in derogation of our labor laws. We note in this regard that "lawyer-consultants" who sometimes skirt the boundaries of questionable conduct have increasingly become involved in combatting union organizing drives during the last decade. *See generally* Note, *The Liability of Labor Relations Consultants for Advising Unfair Labor Practices*, 97 Harv.L.Rev. 529 (1983). Bernbach, at the very least, should have exercised greater caution.

These transgressions form a backdrop to the two discharges at issue. The company asserts it never knew that Restrepo and Orrego were involved in union activities. Also, it claims it had legitimate reasons for dismissing them. Based on circumstantial evidence including the demonstration of anti-union animus in withholding scheduled pay raises and interrogating employees regarding their union affiliation, the Board found the company's reasons pretextual and false.

In reviewing the Board's action in this regard, the test we apply is not whether we might make a different choice between inferences were the matter before us de novo, but whether there is substantial evidence on the record as a whole to support the Board's finding. *Universal Camera Corp v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *NLRB v. Windsor Industries, Inc.*, 730 F.2d 860, 863 (2d Cir.1984); *Mueller Brass Co. v. NLRB*, 544 F.2d 815, 817 (5th Cir.1977).

■ The determinative issue in discriminatory discharge cases is the employer's motivation. As we have previously stated, discerning this is far from simple. In *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 402–03, 103 S.Ct. 2469, 2474–75, 76 L.Ed.2d 667 (1983), the Court affirmed the "*Wright Line* test", an analysis devised by the Board in 1980 to resolve varying approaches of several circuits. This test has two parts. Initially, the General Counsel must establish a prima facie case that protected conduct was a motivating factor in the employer's decision to fire. The burden then shifts to the employer to show, as an affirmative defense, that the discharge would have occurred "in any event and for valid reasons." *Transportation Management*, 462 U.S. at 400, 103 S.Ct. at 2473. *See also Sanchez v. NLRB*, 785 F.2d 409, 413 (2d Cir.1986). If the employer's asserted reasons for the discharge are shown to be a pretext to mask discrimination, he has failed to meet his burden.

Petitioner contests the General Counsel's prima facie case. Specifically, the company questions whether an employer's knowledge of union activity can be inferred from the circumstances surrounding the discharge. The company also contends that the same circumstantial evidence cannot be utilized to show both knowledge and unlawful motivation.

■ Although the Board may not base its decision on mere conjecture, the element of knowledge may be shown by circumstantial evidence from which a reasonable inference may be drawn. *See, e.g., NLRB v. Wal-Mart Stores, Inc.*, 488 F.2d 114, 116–17 (8th Cir.1973); *NLRB v. Long Island Airport Limousine Service Corp.*, 468 F.2d 292, 295 (2d Cir.1972); *Santa Fe Drilling Co. v. NLRB*, 416 F.2d 725 (9th Cir.1969). Similarly, the Board may infer discriminatory motive from circumstantial evidence. *Windsor Industries*, 730 F.2d at 863. Moreover, as this court noted in *Long Island Airport Limousine Service Corp.*, "there is no good reason why the two factual propositions—employer knowledge of general Union activity and employer anti-Union motivation in discharging a particular employee—need be proved by different

types of evidence." *Long Island Airport Limousine Service Corp.*, 468 F.2d at 295.

■ The Board based its inference of both knowledge and unlawful motivation on essentially three factors: the timing of the discharges in relation to the union activity, the simultaneous nature of otherwise unconnected dismissals, and the employer's manifestation of hostility as adduced from the 8(a)(1) violations.

The discharges occurred three weeks after the two employees first contacted the union and four days after a union meeting. They were dismissed the day the union filed its petition for an election, culminating weeks of concentrated efforts to secure their colleagues' signatures. The abruptness of the discharges and their timing are "persuasive evidence" that the company had moved swiftly to eradicate the two prime movers of the union drive. *NLRB v. Montgomery Ward & Co.*, 242 F.2d 497, 502 (2d Cir.), *cert. denied*, 355 U.S. 829, 78 S.Ct. 40, 2 L.Ed.2d 41 (1957). Moreover, minutes after the firings, Feinberg addressed his workers in what can, de minimis, be described as an effort to curry favor with them.

Additionally, the Board indicated that, although the two were terminated for disparate reasons, they were discharged within minutes of each other. As the Board observed, the manner of the dismissals suggests that the company viewed a nexus between them.

The company's subsequent unlawful acts, detailed above, betray its hostility toward the union campaign. By withholding scheduled wage increases and unlawfully interrogating employees after the election, the company showed its motives. Although these acts are not in themselves dispositive, they provide powerful support for the Board's findings of knowledge and unlawful incentive. Kheel, *Labor Law* § 12.04[2][b] (1987); *but see Midwest Stock Exchange, Inc. v. NLRB*, 635 F.2d 1255, 1264 (7th Cir.1980).

Thus, substantial evidence supports the Board's prima facie case. The *Write Line* analysis, however, does not end here. Once the General Counsel proves a prima facie case, the burden shifts to the employer to demonstrate that he would have discharged the employees absent the protected conduct. The ALJ found that the General Counsel had shown an inference of knowledge and unlawful motivation but that the company had "ample cause" for dismissing them. The Board reversed this determination, finding the asserted reasons pretextual and false.

The petitioner now asserts that the Board improperly rejected the testimony of company witnesses explaining their reasons for the discharges. The company argues that the ALJ credited the testimony of company witnesses that it terminated the two employees for legitimate reasons and, thus, the Board cannot lightly overturn credibility determinations.

The ALJ did not, as petitioner maintains, credit the company's witnesses. For example, he found that the record supported the General Counsel's argument that Restrepo and Orrego's union activities were a motivating factor in the dismissals. Thus, he obviously discredited Steve Feinberg's testimony that he did not know about the union activity until a week after the discharges and that anti-union animus played no part in the decision.

In his opinion, the ALJ also clearly stated his findings on credibility. The omission of any such frank assertion in the section of the decision concerning the discharges demonstrates that he was not making credibility findings but drawing conclusions based on inferences.

The ALJ, however, did make some implicit findings of fact. He credited Steve Feinberg's version of the conversation where Restrepo called Feinberg's father a "son of a bitch." Specifically, he rejected Restrepo's testimony that he made the derogatory remarks only in response to Lester Feinberg's use of the same phrase and that Feinberg never asked for an apology. Thus, the ALJ could conclude that Feinberg had "ample cause" to dismiss Restrepo. The Board, however, in finding that the proffered reasons for the termination were pretextual clearly did not disturb the

ALJ's credibility findings. Rather, it chose a contrary inference that the justifications advanced were not the real reason for the September 23rd firing. We have held that neither the Board nor this court need give special deference to inferences drawn by an ALJ. *Local 259, U.A.W. v. NLRB*, 776 F.2d 23, 27 (2d Cir.1985).

At varying points during this litigation, petitioner advanced three different justifications for Restrepo's discharge: his foul language, his failure to apologize for his remarks, and his disloyalty in complaining to drivers of other limousine companies of the shortchange in pay. Steve Feinberg's testimony particularly reveals the changing nature of petitioner's justifications.[2] Such shifting assertions strengthen the inference that the true reason was for union activity. *Royal Development Co. v. NLRB*, 703 F.2d 363, 372 (9th Cir.1983).

In its brief on appeal, petitioner concentrates its argument on the failure to apologize and the dissemination of allegedly false information to other drivers. As the Board noted, the failure to apologize was not a discrete event. It does not explain the one week delay between the argument and the discharge. Furthermore, the Board found that, given Restrepo's long service, the punishment was disproportionately severe. Specifically, the Board noted that evidence of another driver being retained after drinking a beer on the job demonstrated disparate treatment. While we are not persuaded that this is sufficiently similar to Restrepo's conduct to establish a disparity, it does reveal that the company had tolerated significant breaches of conduct in the past.

Petitioner argues that Restrepo's comments to drivers of other companies placed him within the purview of disloyal acts condemned in *NLRB v. Local Union No. 1229 International Brotherhood of Electrical Workers (Jefferson Standard)*, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953). The Court in *Jefferson Standard* considered the extent to which concerted activity would be accorded protection. In that case, employees involved in a labor dispute had distributed to the general public leaflets disparaging the quality of the employer's products. The Court found such actions disloyal and thus unprotected because they discouraged potential customers. Restrepo, in contrast, communicated to employees of other companies the facts of a pay dispute with his employee. Petitioner makes no charge that would bring Restrepo's conduct within *Jefferson Standard*'s holding. Moreover, given the events here, the Board had substantial evidence to conclude that this reason was pretextual.

The company lastly asserts that Restrepo's cursing at the company president demonstrated sufficient disloyalty to justify discharge. Some courts have excused foul language in the context of a struggle to organize a union. *See, e.g., NLRB v. Cement Transport, Inc.*, 490 F.2d 1024, 1029–30 and n. 7 (6th Cir.), *cert. denied*, 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974); *NLRB v. Thor Power Tool Co.*, 351 F.2d 584 (7th Cir.1965); *but cf., NLRB v. Garner Tool and Die Manufacturing, Inc.*, 493 F.2d 263, 268 (8th Cir.1974). Although foul words in a garage obviously do not carry the same impact they would in the rarefied confines of a corporate executive suite, we need not decide this issue. Rath-

---

**2.** The following excerpt demonstrates this point with remarkable clarity:

BERNBACH: What was the basis for the decision to fire Restrepo at that time?
STEVE FEINBERG: His behavior.
BERNBACH: Which behavior?
STEVEN FEINBERG: Cursing, yelling, talking—
BERNBACH: I mean—
GENERAL COUNSEL'S LAWYER: Objection.
STEVE FEINBERG: I mean going around to all drivers.
ALJ: What?
GENERAL COUNSEL'S LAWYER: Counsel is attempting to prompt the witness to his answer.

BERNBACH: What am I supposed to say? Did you see me attempt to prompt the witness?
ALJ: He can continue to answer it.
STEVE FEINBERG: I forget the question.
BERNBACH: Why did you decide to fire him at the time?
STEVE FEINBERG: Because he was cursing, screaming, going to other people. He never came to apologize like he was told to and I don't believe any employer is going to take that.

er, the focus of our inquiry is on the employer's motivation when the discharge occurred. *NLRB v. A & T Manufacturing Co.*, 738 F.2d 148, 151 (6th Cir.1984). In this case, a full week had passed after Restrepo's comment. The Board was thus fully justified in asserting that this proffered reason was also false.

■ The company claims it discharged Hernan Orrego because, two days before, he had refused to return to Kennedy Airport as the dispatcher ordered. The Board relied on several factors in determining that the company had, in reality, seized upon an innocuous incident to discharge a prime union activist.

When Orrego was dismissed, he was not permitted to explain the incident. This alone raises a serious question whether Feinberg was attempting to find a plausible pretext to discharge him. *Dash v. NLRB*, 793 F.2d 1062, 1068–69 (9th Cir. 1986); *Sioux Products, Inc. v. NLRB*, 684 F.2d 1251, 1258–59 (7th Cir.1982). If Feinberg had allowed Orrego to explain, he would have discovered that Orrego was returning from the airport in rush hour traffic when he received the call. Because he was driving in an express lane in heavy traffic, turning around would have been dangerous.

Moreover, when Orrego arrived at the garage, the dispatcher did not reprimand him or even mention the matter to him. This also raises an inference that the employer was searching for an excuse to terminate Orrego. *NLRB v. Bliss and Laughlin Steel Co., Inc.*, 754 F.2d 229, 235–36 (7th Cir.1985). In addition, the company waited two days before discharging him. Petitioner contends it took two days to prepare Orrego's paycheck, but never explains the lapse of two days before anyone confronted Orrego with the charges.

Finally, the Board noted that on the same day Orrego was dismissed, Feinberg allowed another driver, Byron Estrada, to explain his reasons for similarly refusing a job. Based upon the response, Feinberg rescinded the termination. Although this disparate treatment is persuasive evidence that the asserted reason was pretextual, the company claims that, Orrego, unlike Estrada, had engaged in two acts of misconduct in the two previous months. In July 1983, Orrego apparently stole gasoline for his own car. The company initially discharged him, but then converted it to a suspension after Orrego agreed to reimburse the company for the cost of the gas. After his suspension, Orrego had a "few words" with the employee who turned him in for stealing. The company discharged Orrego but then allowed him to return after a short suspension. The company claims that this third act was, thus, the "final straw."

Although one could infer, as the petitioner would have us do, that Orrego's refusal to take a work assignment was indeed the "final straw," the Board had sufficient evidence to infer instead that the company had excused more severe misconduct in the past, and seized on a minor infraction to dismiss a union activist. Where competing inferences exist, we defer to the conclusions of the Board. *Mueller Brass Co.*, 544 F.2d at 817.

In sum, we find the Board's order to be based on substantial evidence. We thus enforce it in all regards. In a companion order, the Board found that the company's conduct warranted a new election. In light of the five-year delay in this cumbersome litigation, we trust that the election will proceed immediately.