**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BRIDGEPORT AMBULANCE SERVICE, Respondent.**

No. 935, Docket 91–4154.

United States Court of Appeals, Second Circuit.

Argued Feb. 3, 1992.

Decided June 10, 1992.

Magdalena Revuelta, Washington, D.C. (Collis Suzanne Stocking, Supervisory Atty., Jerry M. Hunter, Gen. Counsel, D. Randall Frye, Acting Deputy Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Office of Gen. Counsel, N.L.R.B.; John Truesdale, Office of Executive Secretary, N.L.R.B., Washington, D.C.; and Peter B. Hoffman, Office of the Director, N.L.R.B., Hartford, Conn., of counsel), for petitioner.

Andrea A. Hewitt, Hartford, Conn. (Eliot B. Gersten, Gersten & Clifford, of counsel), for respondent.

Before OAKES, Chief Judge, MESKILL and CARDAMONE, Circuit Judges.

OAKES, Chief Judge:

## I.

This very straight-forward Labor Board application for enforcement of an order primarily involves the application of established law to a discrete set of facts. We grant the application to enforce the order issued on March 29, 1991 against Bridgeport Ambulance Service, Inc. (the "Company"). The decision and order of the Board is reported at 302 N.L.R.B. 58 (1991). The Board affirmed the rulings, findings and conclusions of Joel P. Biblowitz, Administrative Law Judge (the "ALJ"), and adopted his recommended order.

Two complaints, both based on charges of unfair labor practices, were consolidated for hearing before the ALJ. One complaint was asserted by Company employee Ricardo Alcover and is not at issue in this application. The other complaint was asserted by Company employee Linda Sutphin. The consolidated complaint charged that the Company employee walkout on April 18, 1989 was concerted activity protected by the Act and the Company's admitted threat—that unless the employees returned to work within 15 minutes they would be terminated—violated section 8(a)(1) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1) (1988), as restraining or coercing employees in the exercise of their protected rights. Linda Sutphin further charged that the Company violated section 8(a)(1) by discharging her for participating in the walkout. The Company's principal defense was that although the employees' activity was concerted, it was not protected because it went against the Union's wishes and represented a wildcat strike. In addition, the Company as-

serted that Sutphin's discharge was for failure to respond to an emergency call, which itself is grounds for termination. The Company now claims that the decision by the ALJ and, hence, the Board, is not supported by substantial evidence in the record, and that the ALJ and the Board erred by refusing to admit evidence relating to the striking employees' dissatisfaction with their union representation.

The Company operates a business out of Bridgeport, Connecticut, providing ambulance, limousine and medical delivery services, and is concededly an employer engaged in commerce under the Act, sections 2(2), (6), (7), 29 U.S.C. §§ 152(2), 152(6), 152(7). In May 1988, after a Board-conducted election, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 191, AFL–CIO (the "Union") was certified as the exclusive representative of the Company's emergency medical technicians ("EMTs"), paramedics, non-emergency drivers, dispatchers and other non-supervisory employees. Thereafter the Company and the Union negotiated but never reached an agreement. The two complainants were members of Local 191. Sutphin was an EMT employee who, with a partner, was supposed to respond to emergency calls in one of the vehicles.

What happened was that on April 17, 1989, Kurt Leill, who was employed with the Company as a paramedic, was suspended. Sutphin, her partner Renee Seaman, and three other employees asked Leill why he was suspended; he said he was not sure but was going to have a hearing about it the following day. The employees were upset about the suspension, perhaps because of the termination of another employee a few days earlier, and they specifically discussed doing something about it, including a sickout or a sit-in. They decided to have a sit-in at crew's quarters until they met with the Company owner and president, Joseph Lansing. During the sit-in, Molly Chatlos, a supervisor, entered the crew's quarters and said she needed someone to answer a call, and two of the employees present responded to the call. About 10 minutes into the sit-in, Lansing went to the crew's quarters and asked what was going on, and the employees in turn asked him about Leill's suspension and complained about low morale, poor equipment and favoritism. Sutphin and Seaman were the principal speakers. Lansing reported that there would be a hearing the following day and that they could have another meeting at a later date. The sit-in ended when Lansing left.

The next day, April 18, 1989, Sutphin and her partner Seaman began working their regular shift at 8:00 a.m. That morning Leill told Sutphin, in the presence of Seaman and EMT Joe Berry, that he had been terminated and that there would be no hearing. The employees again talked about a sit-in or a walkout and discussed their problems of low morale, low wages and poor equipment. Sutphin and Seaman left to respond to a call and after completing it returned, whereupon Leill told them that the consensus among the employees was to conduct a walkout. Sutphin said she would go along with whatever was decided, and she and Seaman left once again to respond to another emergency. When they came back, Leill told them that the walkout was scheduled for noon that day. Seaman called Ace Ambulance Service based in Fairfield, Connecticut, told them of the planned walkout at the Company, and asked if Ace could place an ambulance on the corner of Stratford and East Main Street in Bridgeport to take emergency calls for the Company. Sutphin and Seaman left once again on a call. When it was completed they asked to return since it was close to noon, and they were cleared to come in by the dispatcher. Then Sutphin and Seaman, along with several other employees, punched out and walked out. Ace Ambulance covered at the corner of Stratford and East Main Street.

Meanwhile, the head of Ace Ambulance had called Lansing to tell him about the intended walkout and that Ace was prepared to cover Bridgeport. Lansing ordered his dispatcher to tell supervisory and any other employees willing to work to be available. Lansing then called the Union and spoke to its secretary-treasurer who

said he knew nothing about the walkout. A little while later, the Union sent a telegram to the Company requesting the "names and addresses of wildcat strikers" so that the Union could advise them that a strike was not authorized and they should return to work. Later that afternoon, Lansing threatened the employees participating in the walkout that they would be fired unless they returned to work within 15 minutes. The following day, April 19, the employees returned to the facility and sat outside.

On April 20 the employees decided to attempt to return to work, and about nine of them, including Sutphin, arrived at the Company's dispatch area at 7:45 a.m. The Company general manager, Alan O'Keefe, told them that they had been terminated and to leave the building or he would call the police. The following day, April 21, the same thing happened.

Thereafter, the Union conducted several meetings with 20 to 30 employees. During the first meeting, the Union business agent told the employees that although the Union had not authorized a walkout, it would try to meet with Lansing to get the employees their jobs back. Later, the Union informed the employees about a list of employees that the Company would not take back, and the employees complained that all of them should be treated equally.

Meanwhile, the mayor of Bridgeport had asked the city director of emergency medical services to mediate the dispute, and he sought to do so. The Union indicated that it was not responsible for the walkout but did want to get the employees back to work. The Company indicated it had given the employees an opportunity to remain when Lansing gave his 15–minute ultimatum. After two days of discussions, an agreement was reached by which (1) all employees allowed to return to work would be under probation but could be terminated for cause with no recourse or representation; (2) the Union had to sign a no-strike, no-lockout agreement; and (3) all employees would be reinstated except three whose reinstatement would be withheld pending an investigation by the city mediator.

Sutphin was one of the three. The mediator said that the reason given by the Company for not allowing Sutphin to return was that she had refused a call, though this had never been told to her. The mediator asked her for an incident report for the call she had allegedly refused, but she said she could not write such because she did not know what call he was talking about. The mediator responded, "You know what call I am talking about." Thereafter, although she tried to reach him, she was unable to get in touch with him and never gave him an incident report. His investigation went no further and no findings were made. She was never offered reinstatement.

## II.

◼ It is axiomatic that the Board's factual findings are "conclusive" if supported by "substantial evidence on the record considered as a whole." Section 10(e) of the Act, 29 U.S.C. § 160(e). The Board's reasonable inferences in applying the law to the facts may not be displaced even though the reviewing court might justifiably have reached a different conclusion were the matter before it de novo. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Abbey's Transportation Services, Inc. v. NLRB*, 837 F.2d 575, 579 (2d Cir.1988).

◼ Section 7 of the Act, 29 U.S.C. § 157, guarantees employees the right to "engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection...." Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), prohibits employers from interfering with, restraining or coercing employees in the exercise of their section 7 rights. Section 9(a) of the Act, 29 U.S.C. § 159(a), while stating that collective bargaining representatives shall be exclusive representatives of all the employees for purposes of collective bargaining in respect to pay, hours, or other conditions of employment, does not qualify the employee's own section 7 right to engage in concerted activities for mutual aid or protection. *East Chicago Rehabilitation Center, Inc. v.*

*NLRB,* 710 F.2d 397, 402 (7th Cir.1983), *cert. denied* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984). Thus, although—by virtue of the provisions of section 9(a)—employees' attempts to bargain directly with their employer when they have a union representative are not protected activity under the Act, *Emporium Capwell Company v. Western Addition Community Organization,* 420 U.S. 50, 65–70, 95 S.Ct. 977, 986–88, 43 L.Ed.2d 12 (1975), not all wildcat concerted activity is outside the protection of the Act. For example, in *NLRB v. Owners Maintenance Corp.,* 581 F.2d 44, 49 (2d Cir.1978) we held that a wildcat leafletting campaign constituted concerted activity protected under section 7. In that case, we distinguished *Emporium Capwell Company,* pointing out that there minority employees repudiated a contractual grievance mechanism and sought to compel separate bargaining by exerting economic pressure through picketing and leafletting calling for a boycott, while in *Owners Maintenance* the goal of the leafletting campaign was not separate bargaining but the enlistment of support for the employees' rights in a grievance proceeding. *Owners Maintenance Corp.,* 581 F.2d at 49. *See also East Chicago Rehabilitation Center,* 710 F.2d at 402 ("Unless ... a wildcat strike is called for the purpose of asserting a right to bargain collectively in the union's place or is likely, regardless of its purpose, to impair the union's performance as exclusive bargaining representative, section 9(a) does not put the strikers beyond the pale of section 7.") Other concerted activities, such as those aimed at changing working conditions, that further the mutual aid or protection of employees are also protected. *See NLRB v. A. Lasaponara & Sons, Inc.,* 541 F.2d 992, 998 (2d Cir.1976), *cert. denied* 430 U.S. 914, 97 S.Ct. 1325, 51 L.Ed.2d 592 (1977) (employee's work stoppage to protest Palm Sunday work schedule constituted protected concerted activity).

In this case, there was substantial evidence supporting the Board's and the ALJ's finding that the walkout of April 18 was not called for the purpose of bargaining directly with the Company and did not impair the Union's performance as exclusive bargaining representative. The employees mentioned low morale, poor equipment, unfair treatment and favoritism as well as what they considered to be the unfair suspension and later discharge of employee Leill. As such, their sit-in and walkout constituted concerted activity for their mutual aid or protection.

While the Company argues that there is no evidence that the employees' demands were in accordance with the objectives and policies of the Union, the concerted activity here did not denigrate the Union's role as collective bargaining representative. This is true even though the Union was not contacted prior to the walkout and did not authorize the walkout. Indeed, we agree with the Board that these facts come closest perhaps to the Seventh Circuit case above cited, *East Chicago Rehabilitation Center,* 710 F.2d at 399–400 (spontaneous, unorganized walkout in protest against employer's unilateral change in respect to lunch periods protected under section 7 even though union was not consulted and was in fact discussing the change with the employer).

■ The Company also contends that it was denied the opportunity to show that the employees' course of action was at cross purposes with the Union because the ALJ improperly excluded, as irrelevant, testimony regarding the employees' dissatisfaction with the Union prior to the walkout. However, the fact that there may have been some generalized dissatisfaction with the Union would not in and of itself establish that the employees' actions at issue here impinged on the Union's role as the exclusive representative for collective bargaining. Thus, this evidence was largely irrelevant to the determination of whether the employees' activity was protected. For this reason, the ALJ did not exceed his discretion in excluding the evidence, and the Board did not err in affirming the ALJ.

Nor does the fact that the Union ultimately did not contest Leill's discharge make the concerted activity unprotected. This decision by the Union does not show that the Union favored his discharge.

Rather, it shows only that the Union was willing to let that discharge go in order to secure the reinstatement of as many striking employees as possible.

■ As to Sutphin's discharge, remedied by the Board's reinstatement and back pay order, the evidence is closer but we still believe that substantial evidence in the record supports the ALJ's and Board's finding that her section 7 protected activity was "a motivating factor" in her discharge. An employer's motivation is a factual question committed in the first instance to the Board. *United Aircraft Corp. v. NLRB,* 440 F.2d 85, 91–92 (2d Cir.1971). Circumstantial evidence may of course be utilized in drawing any inference of unlawful motivation. *NLRB v. Link–Belt Co.,* 311 U.S. 584, 602, 61 S.Ct. 358, 367, 85 L.Ed. 368 (1941); *NLRB v. Windsor Industries, Inc.,* 730 F.2d 860, 863 (2d Cir.1984). True, once it is established that the employment relationship was adversely affected by the employer's discriminatory conduct, the latter may escape liability by showing that it would in fact have taken the same action even in the absence of the employee's protected activity. *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 401–03, 103 S.Ct. 2469, 2474–75, 76 L.Ed.2d 667 (1983); *Abbey's Transportation Services, Inc. v. NLRB,* 837 F.2d 575, 579 (2d Cir. 1988).[1]

There was substantial evidence that Sutphin's termination was, in part, unlawfully motivated. Sutphin and her partner, Seaman, had been the most outspoken on April 17, and when the company decided to take back all the strikers except for three, two of them were Seaman and Sutphin. The Company never told Sutphin about the reasons for her termination.

It now contends that it terminated her because she refused a call. While this may be an offense which requires immediate termination, neither the Company nor the city mediator ever investigated whether this was in fact the case. Lansing testified at the Labor Board hearing that, before he met with the employees during the sit-in of April 17, Supervisor Chatlos told him that Sutphin had refused a call. However, Lansing did not speak to her at that time about the alleged refusal, and indeed she was never told what call she was supposed to have refused. In fact, the record shows through the Company's log of calls for April 17 that the two calls following the alleged refused call were assigned to and answered by Sutphin and Seaman, operating as team number 713. It is now claimed that a call coming in at 2:17 p.m. involving a man down at 10 Henry Street, which the log shows was "rolled to Ace," was the one refused by Sutphin. But in an affidavit submitted to the Unemployment Compensation Board and to the Labor Board before the hearing before the ALJ, it was stated that the refusal had occurred on April 18, a day in which the dispatcher said Sutphin and Seaman had not refused any calls.

Leaving aside the confusion regarding the date of the alleged refusal, there is confusion as to which call the Company was claiming was refused. There were two emergency calls at 2:17 p.m. on April 17: one, as mentioned, involving a man down, and the other involving a choking child at McDonald's. Lansing's affidavit to the Board stated that the refused call was the one involving the choking child, and this was also testified to by employee Taylor. However, at the hearing and now in its brief, the Company claims that the man down call was the one refused, and the log of calls shows that the choking child call was assigned to employees Tarrentino and Capporrale, operating as team 717. There is a punch card for the man down call which is in our record and which purports to show that it was assigned to Sutphin and Seaman as team 713, but the numbers are crossed out and the ALJ found that he could not see that the vehicle assigned was

1. We note the Company's argument that evidence of anti-union animus and of an employee's actions to discourage union membership is necessary for a finding of unlawful discharge, but point out that this is a section 8(a)(1) case, not a section 8(a)(3) case, 29 U.S.C. § 158(a)(3), which makes it an unfair labor practice to discourage union membership. Here, once again, at issue is concerted activity protected under Section F. *See Owners Maintenance Corp.,* 581 F.2d at 49.

for certain 713, as Lansing testified it was. The tape monitor of calls which was introduced in evidence could not be transcribed, although the words "man down" appear. Sutphin testified that she never refused a call on the day in question and did not learn of the allegation until she was told by Best to write an incident report.

In short, given the inconsistencies in the Company's allegations and in the testimony, the ALJ cannot be faulted for having credited Sutphin's testimony that she had not refused any calls, and finding that the Company did not meet its burden of showing that it would have discharged her even in the absence of her protected activity.

For the reasons above stated, we grant the application for enforcement.