# United States Court of Appeals
## For the First Circuit

No. 03-1965

E.C. WASTE, INC. D/B/A WASTE MANAGEMENT OF PUERTO RICO,

Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent, Cross-Petitioner.

PETITION FOR REVIEW OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

Before

Selya, Circuit Judge,

Stahl, Senior Circuit Judge,

and Lynch, Circuit Judge.

Luis R. Pérez Giusti, with whom Mignucci & Pérez Giusti, P.S.C. was on brief, for petitioner.
Jule Brock Broido, Supervisory Attorney, with whom Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, were on brief, for respondent.

February 25, 2004

**SELYA**, **Circuit Judge**.  E.C. Waste, Inc. d/b/a Waste Management of Puerto Rico (the Company) asks us to set aside a decision and order of the National Labor Relations Board (the Board), reported at 339 N.L.R.B. No. 39 (June 13, 2003).  The Board cross-petitions for enforcement of its order.  We have jurisdiction under section 10(f) of the National Labor Relations Act (the Act), 29 U.S.C. § 160(f), inasmuch as the Board's order is final and the putative unfair labor practices occurred in Puerto Rico.

The Board found in relevant part that the Company (i) had engaged in a pattern of conduct that violated section 8(a)(1) of the Act, id. § 158(a)(1), and (ii) had fired Blanca Santana because of her suspected pro-union leanings, in derogation of section 8(a)(1) and (3) of the Act, id. § 158(a)(1) & (3).  To the extent that these findings are challenged in this proceeding — a matter to which we shall return — the question presented is whether they are supported by substantial evidence in the record.  See NLRB v. Horizon Air Servs., Inc., 761 F.2d 22, 25 (1st Cir. 1985).

Certain background facts are undisputed.  As its trade name implies, the Company collects and disposes of waste.  It has seven offices within Puerto Rico, including one in Humacao.  In April of 2000 — all dates are in that year unless otherwise indicated — Santana began work at the Humacao office on assignment from an agency that supplies temporary staff assistance.  On

-2-

September 11, she accepted an offer of regular employment from the district manager, Manuel Fresneda. The Company unilaterally designated December 11 as the end of Santana's probationary period and inserted that date in her personnel form.

Local 901 of the Union De Tronquistas De Puerto Rico (the Union) filed an election petition with the Board's regional office on October 13. The Union sought to represent the Company's clerical employees at Humacao (a proposed bargaining unit that included Santana). An election was scheduled to take place on November 21. Although Santana did not sign a union authorization card, she told at least two coworkers, Angie Santiago and Iris Andrews, that she would vote for the Union.

From this point forward, the critical facts are controverted. There is substantial evidence, however, that in mid-October Fresneda interrogated a clerical worker, the aforementioned Iris Andrews, about which employees were sympathetic to the Union. He then recruited Andrews to spy on her coworkers' organizing efforts and to convince Santana to vote against the Union.

On October 19, Fresneda and Wilma Figueroa (the Company's human resources manager) met with the clerical workers. During the meeting, Fresneda told the employees that if the Union succeeded in its quest, bargaining would begin "at zero." He embellished upon this pronouncement by declaring that there would be no assurances of either job security or paid benefits.

As the meeting progressed, Figueroa inquired, without success, as to the identity of the Union's "delegate" (i.e., the member of the proposed bargaining unit who was leading the charge for unionization). Figueroa also insisted that the attendees share their work-related problems with her. For the most part, she received a taciturn response. When Figueroa pressed Santana on this issue, the latter fended off the incessant questioning by expressing pleasure with the raise that she recently had received and denying that any problems existed.

Soon after this meeting, Santana asked Andrews whether she had told anyone about Santana's intention to vote for the Union. Andrews ducked the question. She admitted, however, that Fresneda had enlisted her help in persuading Santana to vote against unionization.

In the early morning hours of October 23, Santana's infant son became ill and she took him to the emergency room. She telephoned the office a full half-hour before her shift was to start and asked for her supervisor, Milisha González. Since González had not yet arrived, Santana explained her predicament to José Orlando Hernández, a group leader who happened to be in the office. She said that if she was able to leave the hospital at a reasonable hour, she would come to work. As matters turned out, the exigencies of treatment forced Santana to remain at her son's side throughout the day.

The next morning, Santana reported for work at the usual time and volunteered to furnish González with proof of the emergency room visit. González declined the offer, stating that there was "no problem." That statement proved to be overly sanguine: the next day, González handed Santana a reproving memorandum written by the Company's controller, José Rodriguez, in which Rodriguez asserted that Santana had promised to arrive at work late on October 23 but had never appeared. Santana immediately protested this mischaracterization.

Rodriguez's memorandum laid the groundwork for what transpired next. On October 26, he summoned Santana and handed her a letter of dismissal. The letter stated only that the Company was terminating her employment "for not having completed satisfactorily [her] probationary period." Despite Santana's importunings, no one would elaborate on this cryptic statement.

In due season, the Union lodged unfair labor practice charges against the Company. These charges, which were prosecuted by the Board's regional counsel, involved both the Company's overall conduct vis-à-vis the Union's organizational effort and its treatment of Santana. The charges were heard by an administrative law judge (ALJ). The ALJ found that the Company had transgressed section 8(a)(1) of the Act by improperly interrogating employees, threatening them with economic reprisals if they voted for unionization, impermissibly soliciting employee grievances,

-5-

creating an impression that pro-union activities were under surveillance, and asking an employee (Andrews) to spy on her coworkers (i.e., to note and report their pro-union activities). The ALJ further found that the Company had violated section 8(a)(1) and (3) of the Act by cashiering Santana because it believed that she would vote for the Union.

The Company appealed. The Board, in the absence of exceptions, adopted the first (generalized) set of findings. It simultaneously overruled the Company's exceptions to the second set of findings and upheld the ALJ's assessment of Santana's firing. Its ensuing order required the Company to cease and desist from these unfair labor practices and from interfering with, restraining, or coercing employees in the exercise of their statutory rights. As to Santana, the order directed the Company to offer her reinstatement, make her financially whole, and post a remedial notice.[1]

We need not linger long over the Board's generalized findings. Section 7 of the Act, 29 U.S.C. § 157, guarantees employees "the right to self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing . . . ." In turn, section

---

[1]In addition, the Board's decision and order resolved issues touching upon the representation proceeding. These issues are not before us at this moment. See Boire v. Greyhound Corp., 376 U.S. 473, 476-78 (1964) (explaining that representation proceedings are not subject to direct judicial review).

8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their section 7 rights. Id. § 158(a)(1). Here, the ALJ found myriad violations of section 8(a)(1) and the Company, in its appeal to the Board, did not object to those findings. See E.C. Waste, Inc., 339 N.L.R.B. No. 39 at n.1. Consequently, the Board adopted the findings.

That ends this aspect of the matter. When a party fails to raise particular issues before the Board, it ordinarily forfeits any right to challenge those findings on a petition for judicial review.[2] See Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 665-66 (1982); see also 29 U.S.C. § 160(e). That rule pertains here. It follows inexorably that the Board is entitled to summary enforcement of those portions of its order that are based on the unappealed findings. See McGaw of P.R., Inc. v. NLRB, 135 F.3d 1, 11 (1st Cir. 1997); Horizon Air Servs., 761 F.2d at 26. We hasten to add, however, that those findings remain in the case, and we are free to draw upon them to put the contested violation — Santana's firing — into proper perspective. See McGaw, 135 F.3d at 7; NLRB v. Clark Manor Nursing Home Corp., 671 F.2d 657, 660 (1st Cir. 1982).

---

[2]There is, of course, an exception that may apply in extraordinary circumstances. See, e.g., Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 896 n.7 (1984); NLRB v. Marshall Maint. Corp., 320 F.2d 641, 645 (3d Cir. 1963). We discern no extraordinary circumstances here.

This brings us to the Board's findings anent Santana. We start our analysis by erecting the applicable legal framework. Section 8(a)(3) of the Act prohibits employer "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). An employer violates section 8(a)(3) by punishing an employee for engaging in pro-union or other protected activities. Horizon Air Servs., 761 F.2d at 27.

Withal, not every dismissal during a union organizing campaign infracts section 8(a)(3). Whether or not a particular dismissal crosses the line typically depends on the employer's motive. Under the applicable test, a violation is established where the General Counsel has shown that an employer's antipathy toward pro-union or other protected activity was a substantial or a motivating factor for an adverse employment action. Id. In the first instance, the General Counsel satisfies this test by demonstrating (i) the employee's engagement in the protected activity; (ii) the employer's knowledge of that activity; (iii) the employer's antipathy toward it; and (iv) a causal link between the antipathy and the adverse employment action. NLRB v. Transp. Mgmt. Corp., 462 U.S. 393, 401-03 (1983).

Upon such a showing, the burden shifts to the employer to prove that it would have taken the same action in the absence of the protected activity. Id. Even if the employer proffers a

-8-

seemingly plausible explanation, however, the Board does not have to accept it at face value. If the Board supportably finds that the reasons advanced by the employer are either insufficient or pretextual, the violation is deemed proven. Cumberland Farms, Inc. v. NLRB, 984 F.2d 556, 560 (1st Cir. 1993); Boston Mut. Life Ins. Co. v. NLRB, 692 F.2d 169, 171 (1st Cir. 1982).

In addressing such questions, direct evidence of pretext is not required. To determine motive, the Board may rely on indirect evidence and inferences reasonably drawn from the totality of the circumstances. See NLRB v. Link-Belt Co., 311 U.S. 584, 602 (1941); cf. Desert Place, Inc. v. Costa, 123 S. Ct. 2148, 2154 (2003) (explaining that, to establish a discriminatory motive, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence"). Among the factors that the Board may consider are such things as the timing of the adverse employment action. Abbey's Transp. Servs., Inc. v. NLRB, 837 F.2d 575, 580 (1st Cir. 1988).

The Board's findings with respect to motivation are binding on a reviewing court as long as those findings are supported by substantial evidence. Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951); Horizon Air Servs., 761 F.2d at 25. When a court is called upon to make such a determination, the Board's credibility assessments normally are entitled to great respect. McGaw, 135 F.3d at 7. Measuring the instant record against these

benchmarks, we conclude, without serious question, that substantial evidence supports the Board's finding that the Company discharged Santana in order to prevent her from voting for the Union in the upcoming election. We explain briefly.

The Company's initial protest is that it did not know how Santana was likely to vote. It is settled beyond peradventure, however, that inferences drawn from circumstantial proof may suffice to establish knowledge. NLRB v. Hosp. of San Pablo, Inc., 207 F.3d 67, 74 (1st Cir. 2000); Abbey's Transp. Servs., 837 F.2d at 579-80. Here, the Board reasonably could have inferred from the evidence of record that the Company knew (or, at least, suspected) that Santana had decided to cast her lot with the Union. To amplify, the Board supportably found that Santana told Andrews that she planned to vote in favor of the Union and that Fresneda enlisted Andrews as a covert operative. One of Andrews's tasks was to report back to Fresneda on her colleagues' attitudes toward unionization. From this collocation of circumstances, we think that the Board reasonably could have inferred — as it did — that Andrews relayed the information about Santana's intentions to Fresneda (and, thus, to the Company).

In an effort to parry this thrust, the Company posits that it could not have suspected Santana's pro-union bias because her statement at the October 19 meeting that she had "no problem" with her working conditions sent a different signal. This argument

-10-

is unpersuasive. The record supports a conclusion that Santana responded in that way only because Figueroa was engaged in the coercive solicitation of grievances — and the employer had full knowledge of the pertinent circumstances. Seen in this light, the Board was not compelled to draw the inference that the Company only could have taken Santana's statement as a public declaration of fealty (or even of neutrality).

The remaining elements of the General Counsel's case fall readily into place. Given the litany of generalized section 8(a)(1) violations, the Company's anti-union animus seems evident. The uncontested findings show plainly that the Company responded to the Union's organizing campaign with a no-holds-barred effort to stifle employee support. That deep-seated hostility, in turn, makes more plausible the Board's further finding that the Company perceived Santana as pro-union and fired her so that she would be unable to cast a vote in the upcoming election.

What is more, the probative value of the timing of the Company's action — firing Santana in the critical interval between the time that the Union filed its petition for recognition and the planned representation election — is obvious. The Board reasonably could have considered that chronology as a further indication that Santana's perceived support for the Union was instrumental in her discharge. See, e.g., Abbey's Transp. Servs., 837 F.2d at 580.

The Company's attempt to blunt the force of the timing backfires. It claims that it had to act against Santana on October 26 for a neutral reason: her probationary period had expired the previous day and the Company wanted to jettison her before she accrued an entitlement to severance pay. But the Board found (and the Company's records show) that Santana's probationary period was not due to end until December 11. Thus, the premature curtailment of Santana's probationary period operates in favor of the Board's "unlawful motive" finding. See Shattuck Denn Mining Corp. v. NLRB, 362 F.2d 466, 470 (9th Cir. 1966) (explaining that an employer's proffer of a false rationale for an employment decision permits the Board to infer that the employer's actual reason "is one that [it] desires to conceal — an unlawful motive"); see also Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000) (noting that a plaintiff may establish pretext by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a fact finder could infer that the employer did not act for the asserted non-discriminatory reasons.") (citation and internal quotation marks omitted); Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998) (similar).

The Company's argument that Puerto Rico Law 80, 29 P.R. Laws Ann. §§ 185a-185m, automatically shortened Santana's probationary period from ninety days to forty-five days, so that it

ended on October 25 rather than on December 11, rests on two fictions. First, Law 80 requires the mutual execution of a writing, prior to the commencement of the employment, specifying the length of the probationary period and the beginning and ending dates of that period. Id. § 185h. The Company adduced no proof that any such writing was ever drafted or signed. Second, the Company's position tries to turn a severance-pay law, meant as a shield for employees, into a sword to be wielded by employers. Because we endorse the Board's well-reasoned rejection of this claim, see E.C. Waste, Inc., 339 N.L.R.B. No. 39 at n.2, we dismiss this argument without further elaboration. Here, as in McGaw, 135 F.3d at 10, it would be perverse to allow the Company "to invoke a statute enacted for the protection of workers as a justification for its unlawful labor practices."

The Company has a fallback position: it notes that, on the same day that it discharged Santana, it terminated the employment of its spy (Andrews). Based on this temporal coincidence, the Company suggests that "it would not seem logical . . . to dismiss a union supporter and an apparent anti-union employee at the same time" because "nothing could be achieved (in terms of gaining a vote)." Petitioner's Br. at 37. This shows, the Company says, that both firings were legitimate.

We reject this suggestion. An employer should not be permitted to disguise its unlawful motive for discharging a pro-

-13-

union activist by the simple expedient of taking a simultaneous action against a coworker who has no union ties. We hold unhesitatingly that retaliating against an employee for supporting a union violates section 8(a)(3) even if the employer also targets other employees who are not pro-union. See McGaw, 135 F.3d at 8.

The short of the matter is that the General Counsel made out a strong prima facie case, sufficient to shift the burden to the Company to prove that it would have discharged Santana even if it did not regard her as pro-union. The Company endeavors to carry this burden, maintaining that it had a legitimate, nondiscriminatory reason for ousting Santana: her absenteeism. This endeavor is unsuccessful.

We remark, first, the lack of constancy in the Company's explanation. At the time it pink-slipped Santana, it refused to give her any substantive reason for her discharge. Then, in its original position statement to the Board's regional director, the Company asserted that it discharged Santana because she had "a demonstrated pattern of not arriving on time to work in the mornings." This assertion proved to be false: Fresneda admitted in his testimony that Santana was late only once, and then by a paltry seventeen minutes. The Company then came up with another explanation: at the unfair labor practice hearing, Fresneda testified that he and Rodriguez made the decision to fire Santana because she had been absent three times in a relatively short time

span. The ALJ rejected this testimony as "hollow" and found that the Company's stated ground was pretextual. The Board agreed.

This finding is premised on substantial evidence. In the first place, an employer's shifting explanations for discharging an employee may themselves serve either to ground or to reinforce a finding of pretext. See Abbey's Transp. Servs., 837 F.2d at 581. This is such a case.

In the second place, the absenteeism claim is implausible on its face. Although the Company now laments Santana's supposed attendance problems, the record reflects that she missed work on only three occasions. That statistic is exaggerated, however, because the Company had approved two of her three absences. To cinch matters, the third absence — the one involving Santana's sick child — was consistent with company policy, which at the time required an employee to notify her "immediate supervisor or management (in the office)" of an emergency or illness at least thirty minutes before her shift was slated to begin. Santana did exactly that, and her supervisor acknowledged the next day that her absence posed "no problem."

To say more would be to paint the lily. A party who seeks to topple a factfinder's credibility determination typically faces a steep uphill climb. In this instance, the Company cannot scale those heights. Its claim that Santana's three absences led to her termination simply cannot be squared with its

contemporaneous actions. On this record, the Board was amply justified in finding that poor attendance was a pretext designed to mask the true reason for Santana's ouster.

We need go no further. We have considered each and all of the employer's contentions (including some so baseless as not to warrant discussion in this opinion) and find them without merit. Concluding, as we do, that the Board's findings are well-supported, we deny and dismiss the petition for review and grant the cross-petition for enforcement of the Board's order. Costs are to be taxed in favor of the Board.

**So Ordered**.