**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HOSPITAL SAN PABLO, INC., Respondent.**

No. 99–1666.

United States Court of Appeals, First Circuit.

Heard Jan. 7, 2000.

Decided March 27, 2000.

John D. Burgoyne, Assistant General Counsel, National Labor Relations Board, with whom Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, were on brief, for petitioner.

Jay A. García–Gregory, with whom Tristán Reyes–Gilestra and Fiddler, Gonzalez & Rodriguez, LLP were on brief, for respondent.

Before STAHL, Circuit Judge, CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

The General Counsel of the National Labor Relations Board brought unfair labor practice charges against the Hospital San Pablo (the "Hospital") in Bayamón, Puerto Rico, for actions the Hospital took in response to a union organizing campaign that took place in late 1996 and early 1997. The General Counsel now petitions this court to enforce a decision and order in which a divided Board panel concluded that the Hospital had committed two unfair labor practices. The Board found that the Hospital discharged Adíbal Arroyo because of his union activities, in violation of National Labor Relations Act ("NLRA" or the "Act") § 8(a)(1), 29 U.S.C. § 158(a)(1), and § 8(a)(3), 29 U.S.C. § 158(a)(3). Additionally, the Board separately found that the Hospital violated § 8(a)(1) of the Act by threatening to subcontract employees' work and reduce employees' benefits if the union was successful and by giving employees the impression that their union activities were under surveillance. In addition to other forms of relief, the Board ordered the Hospital to offer Arroyo reinstatement and back pay and to cease its oppressive practices.

The Board issued its Decision and Order on December 15, 1998. *See Hospital San Pablo, Inc.*, 327 N.L.R.B. No. 59 (Dec. 15, 1998), *available in* 1998 WL 881841. One member of the Board dissented from the finding as to Arroyo's discharge, arguing that the General Counsel had not met his burden of "establish[ing] a critical element of his case, i.e., that the [Hospital] knew of Arroyo's union activity." 1998 WL 881841, at *2. The dissent's banner is carried into this court by the Hospital, which also argues that the Board's decision is not supported by substantial evidence on the record as a whole and that the Board's decision goes well beyond the established case law un-

der the doctrine of *Wright Line*, 251 N.L.R.B. 1083, 1980 WL 12312 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981). The Hospital says that it fired Arroyo because he was insubordinate and had a history of employment problems. It also says that statements it made to its employees were merely in response to disinformation and propaganda from the union, the Federación de Trabajadores de la Empresa Privada (the "union"). Because the Board order is clearly supported by substantial evidence on the record as a whole, we grant the petition to enforce the order.

## I. *Standard of Review*

■■■■ But for one legal question, this case turns on whether the facts support the Board's order. This court must accept the Board's factual findings unless those findings are not "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *see NLRB v. Hilliard Dev. Corp.*, 187 F.3d 133, 140 (1st Cir.1999). The Board, of course, "may not distort the fair import of the record by ignoring whole segments of the uncontroverted evidence." *Maine Yankee Atomic Power Co. v. NLRB*, 624 F.2d 347, 360 (1st Cir.1980). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *American Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981) (internal quotation marks and citation omitted). In particular, the credibility determinations of the Administrative Law Judge ("ALJ") who heard and saw the witnesses are entitled to great weight. *See Holyoke Visiting Nurses Ass'n v. NLRB*, 11 F.3d 302, 308 (1st Cir.1993). The ultimate question remains "whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366–67, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998).

## II. *Discharge of Arroyo for Union Activity*

■■■■ The Hospital's primary attack on the Board's decision is that the General Counsel failed to meet his burden of showing that Arroyo's firing was the result of anti-union animus. *See NLRB v. South Shore Hosp.*, 571 F.2d 677, 684 (1st Cir. 1978). The Hospital's argument is initially premised on an error of law. It argues that the General Counsel has the burden of showing that the dominant motivating factor behind an employer's action was not a proper business one, but was rather antiunion animus. This is incorrect; the General Counsel must simply show that Arroyo's discharge was based "in whole *or in part* on antiunion animus." *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (emphasis added). In other words, the General Counsel must show "that the employee's protected conduct was a substantial or motivating factor in the adverse action," *id.*, but not that it was the sole factor.

■■■■ Section 8(a)(3) of the NLRA provides that it shall be an unfair labor practice for an employer "to encourage or discourage membership in any labor organization" through "discrimination in regard to hire or tenure of employment or any term or condition of employment." This provision is supplemented by § 10(c) of the Act, 29 U.S.C. § 160(c), which authorizes the Board to take remedial action, with the following limitation: "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." As this court said in *Wright Line*,

[s]ection 8(a)(3) imposes a prohibition on employers which is simple to state but often difficult to apply in practice: they may not discharge an employee because of his union activity; but they may and should apply their usual rules and disciplinary standards to a union activist just

as they would to any other employee. Hence, in a given discharge case it must be decided whether the employer acted because of the employee's union affiliation, or whether he acted because of some factor unrelated to the employee's union status.

662 F.2d at 901 (citing *Local 357, Int'l Bhd. of Teamsters v. NLRB*, 365 U.S. 667, 675, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961)). Under *Wright Line*,

[o]nce [a prima facie showing] is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct. The "burden" referred to, however, is a burden of going forward to meet a prima facie case, not a burden of persuasion on the ultimate issue of the existence of a violation.

*Id.* at 905 (internal quotation marks, citation, and footnote omitted).

 The General Counsel satisfies his burden of establishing a prima facie case by showing (1) that the employee was engaged in protected activity; (2) that the employer was aware of the activity; (3) that the employer harbored animus toward unions; and (4) that there was "a causal connection between the animus and the action taken" against the employee. *McGaw of Puerto Rico, Inc. v. NLRB*, 135 F.3d 1, 8 (1st Cir.1997). If that initial burden is met, "[t]he burden then shifts to the employer to prove, by a preponderance of the evidence," that it would have taken the same action against the employee even if the employee had not engaged in the protected activity. *Id.; see Transportation Management Corp.*, 462 U.S. at 401–403, 103 S.Ct. 2469; *NLRB v. Crafts Precision Indus., Inc.*, 16 F.3d 24, 27 (1st Cir.1994).

Thus, we recount the factual findings that support the ALJ's and Board's conclusions in light of these standards. We do so separately as to the two different violations.

A. *Record Evidence*

1. *Arroyo's Union Activity*

Arroyo worked in the Hospital's housekeeping department, which had 99 employees. Arroyo contacted the union in October 1996 and met with union president Víctor Villalba shortly thereafter. Later, Arroyo, coworker Roberto Cruz, and several other employees met with Villalba at the union office; Arroyo and others signed union authorization cards, and Arroyo was designated the custodian of the cards and the collector of employee signatures. Arroyo and Cruz started distributing cards to other employees in the Hospital's stairways, bathrooms, empty rooms, and machine rooms, but not in plain sight of the supervisors. They also gave out cards at the entrance to the Hospital at the start of work and in the parking lot at lunch, and they met with employees to discuss the union, both at the Hospital and away. Some meetings were held near the cafeteria, close to the Hospital administration office. An election petition for a limited unit of housekeeping employees was filed on November 7, 1996. This petition was withdrawn, however, and the union attempted to gather more cards for a larger unit. The Hospital was well aware at this time that an organizing campaign was underway; it held a meeting with its supervisors to inform them of this fact.

On December 17, 1996, the union filed another election petition with the NLRB, this time for a larger unit of all non-professional employees. This petition was also withdrawn, due to insufficient interest. Although Arroyo was on vacation from November 15, 1996, until January 9, 1997, he continued his union organizing activities during this time. In January Villalba asked Arroyo and Cruz to gather more cards. The two gathered roughly another forty-five authorizations, both at and away from the Hospital.

A third petition was filed on January 16, but the Hospital did not know about it until after Arroyo was terminated. The

union eventually lost the election, which was held in February.

### 2. *Arroyo's Discharge*

Arroyo's discharge was the result of a dispute at work on January 13, 1997. Víctor Báez, Arroyo's supervisor, assigned Arroyo and Jorge Hernández to clean and wax a floor in the medical records office. It was a holiday and Báez apparently wanted to get the work done before the offices reopened the next day. Scheduled to work from 6:00 a.m. to 2:00 p.m., Arroyo asked if they could work through their lunch period and leave early. This was often done in practice, although the Hospital claimed it had told its managers to curtail this practice. According to Hernández and Arroyo, later that morning Báez told them that they should continue to work through their lunch hours and could leave at 1:00. Arroyo then made family plans for shortly after 1:00, and he and Hernández worked through their lunch hour. Báez, however, testified that all along he had told the two employees that they needed to remain at work until 1:30.

According to Arroyo and Hernández, ten minutes before the two men were to leave, Báez told them to complete the job and remain at work until 1:30. Arroyo asked why, since Báez had given them permission to leave at 1:00 and Arroyo had made an appointment for 1:00. Hernández added that he had recently been allowed to leave at 1:00 after working through his lunch hour. Báez repeated that the two had to stay and work until 1:30. Arroyo told Báez that they could discuss the matter with the head of the housekeeping department when Arroyo next returned to work.

Hernández and Arroyo left the Hospital together at 1:00, despite Báez's wishes. At the parking lot Hernández told Arroyo that he had to go back into the Hospital to see someone. Hernández testified that he did not perform any work upon his return. He also testified that upon his return to the Hospital, he saw the Hospital Comptroller, José Marzán, and chatted with him socially. Hernández also said he saw Báez, who asked where Arroyo was. Hernández testified that he told Báez that Arroyo had left and that he, Hernández, had stayed but had not worked. Báez testified that Hernández was working when Báez saw him in the Hospital after 1:00. Marzán also testified that Hernández was working when he saw him in the Hospital after 1:00. Marzán, however, could not say exactly what Hernández was doing.

The remaining work was done the same day by an afternoon shift employee, Héctor Negrón. Negrón testified that the work took one and a half to two hours to complete. Negrón's testimony contradicted Báez's testimony that the work took fifteen minutes to complete.

On his next day of work, January 16, Hernández was called into a meeting with Báez, Begoña Meléndez (the Human Resources Director) and María Eugenia del Río (the head of the unit that included housekeeping). Arroyo was not present for the meeting. Meléndez read a report, signed by Báez, about the events of January 13. The report said Arroyo had a negative and disrespectful attitude, that Báez had insisted the two men stay in order to get the work finished, which would have taken no more than fifteen minutes, and that Hernández had remained at the Hospital and worked while Arroyo had left. Hernández testified that upon hearing the report he denied that he had done any work after 1:00, that either man had violated any Hospital policy, and that Arroyo had been disrespectful. Báez, Meléndez, and del Río, in contrast, testified that Hernández initially agreed with the report and then immediately changed his mind. At the meeting, the Hospital officials told Hernández he would be paid for the work he performed between 1:00 and 1:30 and that nothing would happen to him because he had remained at the Hos-

pital while Arroyo had been insubordinate and had left.

The Hospital officials called Arroyo in next and read him the same Báez report. Arroyo said the report was not true and explained his version of what had happened. Báez repeated that the job could have been completed in about fifteen minutes; Arroyo disputed this and said it was not "manly" of Báez to say this. He asked that Hernández be brought to the meeting to clarify the facts. Meléndez said that was not necessary because she had spoken with Hernández and that he had agreed with the report. Del Río told Arroyo that he should have stayed until 1:30 to complete the job; Arroyo, upset by the comments that the job could have been completed in so little time, responded, "Were you there?" Meléndez admonished Arroyo to be more respectful. Meléndez then fired Arroyo. Meléndez testified that Arroyo displayed a hostile and disrespectful attitude at the meeting while Hernández had not.

## B. *The ALJ's Findings*

The ALJ made specific findings regarding the credibility of the witnesses. The ALJ found Arroyo to be a credible witness and found Báez not to be a credible witness. The ALJ further found Hernández's and Negrón's testimony to be more credible than that of Hospital witnesses del Río, Meléndez, and Marzán. Based upon these credibility determinations and inferences drawn from the evidence presented at the hearing, the ALJ found, regarding the events of January 13, that Báez had initially told Hernández and Arroyo that they could leave at 1:00 and then later told them they had to remain until 1:30, that Hernández had not stayed on to work after 1:00, that Arroyo had not been disrespectful, and that it was not true that the remaining work had taken only fifteen minutes to complete. Regarding the meetings on January 16, the ALJ found that both Hernández and Arroyo had displayed hostile attitudes at the meetings, that Hernández had not initially agreed with the report, and that the Hospital could not have reasonably believed that Hernández had stayed on to work after he had repeatedly denied having done so. Based upon these factual findings, the ALJ concluded that the Hospital had discharged Arroyo because of anti-union animus. The ALJ discounted the Hospital's argument that the different outcomes resulted from Arroyo's and Hernández's different attitudes. The ALJ found that both Arroyo and Hernández could be considered insubordinate, yet Arroyo was discharged and Hernández was not.

■ The ALJ's conclusion is supported by substantial evidence on the record taken as a whole. The evidence presented supports the ALJ's conclusion that the reason given for terminating Arroyo and for treating him differently from Hernández—insubordination—was a pretext. Neither employee had a spotless past work history,[1] and the record indicates no real distinction between them.[2]

■ Further, the Hospital's track record on other "insubordinate" employees showed a far greater tolerance for worse behavior from others.[3] Disparate treat-

---

1. Arroyo's recent work history was good. Although he had on a few occasions been given verbal warnings for minor misconduct, his most recent evaluation had been scored at over 90 (out of 100).

2. A report signed by del Río states that at a meeting with Meléndez (which took place after Arroyo's discharge), Hernández displayed "a very hostile attitude" and "a negative and agitated attitude," yet nothing was done to Hernández. Hernández had also, on a previous occasion, called Báez a "cabrone," which Báez testified was "a great form of disrespect." Hernández was given a warning as a result.

3. There was evidence about the Hospital's treatment of an employee named Angel Rivera, whose provocative and insubordinate conduct was tolerated for a long period of time by the Hospital before he was eventually discharged. Another employee who had a lengthy disciplinary record was suspended,

ment for similar misconduct supports a finding of improper motive, *see Yesterday's Children, Inc. v. NLRB*, 115 F.3d 36, 48–50 (1st Cir.1997), and it belies any argument that the Hospital would have fired Arroyo anyway. Other facts also support the ALJ's conclusion and strengthen the inference that the reason given for Arroyo's firing was pretextual and that the real reason was anti-union animus.[4]

 The dissenting member of the Board panel characterized the ALJ's conclusion that the Hospital knew of Arroyo's union activity—and was thus motivated by anti-union animus—as an inference drawn from three facts, each of which he thought insufficient: (1) the Hospital had "some knowledge of union activity among the employees in general;" (2) the union's first petition was limited to the employees working in the same department in which Arroyo worked; and (3) a member of the Hospital management told an employee that "during previous organizing campaigns" the Hospital "had learned which employees were for the Union." *Hospital San Pablo*, 1998 WL 881841, at *2. This recitation understates the strength of the record, as the evidence outlined above demonstrates. At a minimum, Arroyo was a committed union activist and actually solicited co-workers at the Hospital, and it

is reasonable to believe that someone dropped a hint, if not more, to management. Human nature is not to the contrary. *Cf. NLRB v. Magnesium Casting Co.*, 668 F.2d 13, 16 (1st Cir.1981). Direct evidence of an employer's knowledge of an employee's union activity is not needed; inferences may be used to establish the knowledge. *See South Shore Hosp.*, 571 F.2d at 683 ("It is now well established that such knowledge need not be based on direct personal observation, but can be inferred from the facts and circumstances involved.").

The Hospital makes several arguments in this court that are reasonable arguments to have made to the finder of fact, but that, on appeal, do not compel the conclusion that the Hospital was not motivated by anti-union animus.[5]

The Hospital makes the argument that it did not fire the prime union organizer, Cruz, so it is irrational to think that the Hospital would go after Arroyo, an arguably more minor figure in the union effort. To the contrary, it is entirely rational that the Hospital would prefer to be more subtle, at least to the extent of not picking the most visible symbol of union organizing, if it wanted to send an anti-union message to employees and still claim that there was no

but not terminated, after being caught sleeping on the job.

4. About a week after Arroyo was terminated, Hernández heard that there were rumors that he was involved with union organizing activity. Hernández met with del Río and told her he "had nothing to do with any of that stuff from the union." According to Hernández, Del Río told Hernández "not to worry, that [he] was not on the list." Although del Río denied making this statement, the ALJ did not find the denial credible and credited Hernández's testimony. After Arroyo was terminated, the Hospital paid Hernández for the time that he had repeatedly said he had not worked. Hernández returned the money to the Hospital, giving Meléndez a money order for the overpayment. According to Hernández, Meléndez asked Hernández if he was being pressured to do so by the "Union people." Hernández said no. He also testified

that he told Meléndez that he had told the truth to the Hospital supervisors but that they did not acknowledge it and that the person who lied was Báez.

5. For example, the Hospital argues that at the time of Arroyo's discharge there were no pending petitions for representation and that the two prior petitions had been withdrawn. This does not compel the conclusion that the Hospital thought the danger from the union was over on January 16. Indeed, in November the Hospital held meetings about the union effort with supervisors, and prior to the February election it held meetings with employees. It is just as logical to conclude that the Hospital thought another campaign was in progress as of January 16, or that, even if there was not another campaign on the horizon, the Hospital wished to forestall any possible future campaign by firing one of the organizers and thus sending a message.

anti-union bias. In any event, the argument hardly compels a finding in the Hospital's favor. The Board's order as to Arroyo's discharge is supported by substantial evidence on the record as a whole and will be enforced.

### III. *Threats in Violation of 8(a)(1)*

The Hospital also appeals the Board's second finding—that the Hospital violated § 8(a)(1) of the Act when it made certain statements. The Board panel was unanimous in affirming the ALJ's determination on this charge, *see Hospital San Pablo,* 1998 WL 881841, at *1–*2, and certain aspects of the Board's prescribed remedy relate only to this second finding.

### A. *The Record Evidence*

Executive Director Jorge de Jesús met with Hospital employees three or four times prior to the February 1997 election. According to the testimony of Hospital employee Cristóbal Montesino, de Jesús stated that as a consequence of unionization the Hospital could bring in a private company to do the work the employees were doing and that the employees would then be fired. Montesino, Cruz, and Negrón also testified that de Jesús said that if the union won the election the benefits the employees would receive "would start at zero." De Jesús denied threatening the employees with either loss of benefits or loss of employment. On appeal, the Hospital says that it merely gave information in a neutral way in response to inaccurate statements from the union.

A few days before the election del Río met with Cruz to discuss a disciplinary warning given to Cruz. According to Cruz, del Río said that in earlier campaigns the Hospital "knew which employees were for or against the Union," that "the Hospital had been very good to those employees because it had allowed them to continue working," and that "many of them did not deserve to be working" there. Cruz replied that if the Hospital "knew who was in the Union[,] since Adíbal Arroyo was no

longer there [then he, Cruz,] would be the first one on the list." Del Río responded that he should not "take it that way because that's not where she was coming from." Del Río denied making any statements regarding the union.

### B. *The ALJ's Conclusions*

The ALJ credited the employees' versions of what was said at the meetings with de Jesús, and concluded that de Jesús's statements constituted impermissible threats. "The credibility of witnesses is for the ALJ to determine, and the reviewing court will set aside such findings only when he oversteps the bounds of reason." *NLRB v. American Spring Bed Mfg. Co.,* 670 F.2d 1236, 1242 (1st Cir.1982). We have reviewed the record carefully and find no basis for setting aside the ALJ's determinations.

Threats of job loss violate § 8(a)(1) of the Act. *See NLRB v. Hasbro Indus., Inc.,* 672 F.2d 978, 985–986 (1st Cir.1982) (holding that threats to contract work out if the employees voted for the union violated § 8(a)(1)). De Jesús's statement regarding benefits was also a violation of the Act. *See Wyman–Gordon Co. v. NLRB,* 654 F.2d 134, 145 (1st Cir. 1981) (finding statement that "bargaining would 'begin at zero' and work up" constituted a violation of § 8(a)(1)).

The ALJ also found that del Río made the statements described by Cruz regarding the Hospital's knowledge of which employees were for the union. The ALJ concluded that those statements and del Río's statement to Hernández regarding union organizing activities and "the list," *see supra* note 4, amounted to giving the employees an impression that their union organizing activities were under surveillance. Such coercive conduct violates the Act, *see Hasbro Industries, Inc.,* 672 F.2d at 986–87, and we discern no reason to set aside the ALJ's findings and conclusions in this regard.

The Hospital argues that it is simply not reasonable to believe that such statements were made because no employer today would be so blatant as to say such things, particularly during a union organizing campaign. This is a factual argument best addressed to the finder of fact, not to a reviewing court. The facts of record permit a finding that it was reasonable to conclude that the Hospital was indeed so blatant. The ALJ and the Board so found, and that finding is based on substantial evidence on the record as a whole.

The petition for enforcement is *granted.*