# United States Court of Appeals
## For the First Circuit

No. 05-2025

HOLSUM DE PUERTO RICO, INC.,

Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent, Cross-Petitioner.

PETITION FOR REVIEW AND CROSS-PETITION FOR ENFORCEMENT
OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

Before

Selya and Lipez, <u>Circuit Judges</u>,
and Saylor,[*] <u>District Judge</u>.

<u>Howard S. Linzy</u>, with whom <u>The Kullman Firm</u> was on brief, for
Holsum de Puerto Rico.
<u>Amy H. Ginn</u>, with whom <u>Meredith L. Jason</u>, Supervisory
Attorney, was on brief, for the Board.

August 8, 2006

_____

[*] Of the District of Massachusetts, sitting by designation.

**LIPEZ, <u>Circuit Judge</u>**.  As a result of the company's response to a union organizing campaign, the United Auto Workers International Union filed an unfair labor practices charge against Holsum de Puerto Rico, Inc.  General Counsel for the National Labor Relations Board then commenced a regulatory enforcement action.  After extensive testimony, an administrative law judge determined that Holsum had engaged in unfair labor practices and had terminated employees illegally.  <u>See</u> 29 U.S.C. § 158(a)(1)-(3).  With a slight exception not important here, the Board adopted the judge's findings and conclusions as its own.  Before us, Holsum does not contest most of the Board's findings.  However, it does petition for review of the Board's conclusion that José Torres, a leader of the unionization effort, was fired as a sanction for his protected activity, and the Board's related order that Torres be reinstated to his job at Holsum.  The Board cross-petitions for enforcement of its entire order.  We reject Holsum's petition and grant the Board's.

**I.**

We review the background facts as the Board found them, focusing on the facts involving Torres.  Most of these facts are not disputed here.[1]  Holsum is a commercial bakery, selling bread

---

[1] While Holsum only contests the Board's order as it relates to Torres, the company does argue that the evidence before the Board was insufficient to support a finding of anti-union animus. Holsum also makes a cursory argument that there was no causal connection between any such animus and Torres's termination.  These

and other products to retailers in Puerto Rico. Torres and José Santiago were salesmen for Holsum. Their duties included driving company trucks and delivering baked goods to clients. In the summer of 2002, Torres, Santiago, and some other Holsum salespeople began to talk about forming a union. From the beginning, Santiago took the lead in scheduling meetings, and Torres led the drive to recruit other salespeople to join the union. Initially, Torres recruited other employees informally. By the fall of 2002, however, Torres had begun handing out union authorization cards and telling his coworkers that "the union could better represent their interests."

Holsum had a "union avoidance policy," and its management quickly began observing and discouraging the salespeople's unionization campaign. Private investigators working for the company observed one of the early organizational meetings. Then, in September 2002, Holsum's president, Ramón Calderón, sent a letter to his employees stating that a group of dissatisfied employees had "attacked" the company, creating "a serious threat to your job, your future and the future of your family." The letter -- which the Board did not find was improper in and of itself but which surely shows the company's feelings about the unionization effort -- concluded by instructing employees to read and abide by

undeveloped arguments, which are plainly belied by the evidence, are too insubstantial to warrant discussion.

the company's "union avoidance policy," and to say "'NO' to the union agitators."

Shortly after this letter was sent, Holsum supervisors confronted Torres, Santiago, and several other employees to ask them what they thought about the letter. These inquiries, in combination with other facts, led the Board to conclude that the company had illegally interrogated its workers. When Torres was interrogated about the letter, the conversation quickly became antagonistic. Torres refused to tell his supervisor what he thought of the letter, the supervisor persisted in his questioning, and ultimately Torres told the supervisor that he could not answer without "compromis[ing] himself." The acrimonious interrogation did not stop Torres's efforts on behalf of the nascent union. Until his discharge in the spring of 2003, Torres spent "almost every afternoon" in the company parking lot, soliciting his fellow employees to sign union authorization cards.

In April 2003, Torres was fired. Holsum maintains that it terminated Torres because he violated the company's rule against letting non-employees ride in company trucks. Crediting Torres's uncontradicted account, the Board found that one day in late April a man jumped into Torres's truck while Torres was waiting for a traffic light to change. Torres told the stranger to get out of the truck. The passenger refused to leave and demanded a ride to the next traffic light (in the direction Torres was traveling).

Torres insisted that the person leave the truck and told him that he was prohibited by company policy from transporting passengers. Still, the passenger would not get out, and Torres would not have been able to remove him without resorting to physical force. The light changed, and cars behind the truck started honking. Torres decided that it would be better to transport his unwanted passenger a short distance than to have a physical fight with him in the middle of an intersection. The passenger jumped out of the truck when he reached his intended destination, and Torres continued on his route.

A Holsum supervisor observed the unwanted passenger's brief ride on Torres's truck. When Torres returned to Holsum's warehouse, another supervisor told him that he had been seen with an unauthorized passenger. The supervisor asked Torres to fill out a written report describing the incident. Torres did as he was asked. When Torres arrived at work the next day, two supervisors confronted him and told him that he was suspended without wages or health benefits. The supervisors also instructed Torres to return to the plant the following week for a hearing.

The next week, Torres arrived at the plant at the time he had been told to come, bringing with him a man whom he introduced as his union representative. While Torres had been scheduled to meet with Holsum's Human Resources Director, he was told upon arriving with his union representative that the director was

-5-

unavailable and that he would have to meet with a junior supervisor. He also was told that he would not be allowed to bring the union representative with him. The meeting was short. The supervisor simply told Torres that he had been fired, and then said, "Well, that's all." While Torres asked for a letter explaining the reasons for his discharge, Holsum personnel neither furnished such a letter nor explained to Torres why he had been fired.

A few days after Torres was fired, a Holsum supervisor confronted Santiago as he was loading his truck. The supervisor asked Santiago if he knew that Torres had been fired. When Santiago nodded, the supervisor said that Santiago should "be careful" and "take care of his job" because "he was going to be next." A few days after this conversation, Calderón sent another anti-union letter to Holsum's employees. This letter stated that the company had learned "in the past several days" that "a union continued to threaten the future and security of the Holsum families." Again, the company interrogated its employees about their reactions to the letter.

Later that month, Holsum fired Santiago. Before the Board, Holsum argued that it had terminated Santiago for his unauthorized distribution of six cups of hot coffee to a group of non-employees, including Torres, who were soliciting for the union outside the plant. The Board concluded that "the real reason

Santiago was discharged was that . . . he gave [] coffee to persons who were distributing 'union propaganda against the Company.'"

## II.

Under the National Labor Relations Act, it is illegal to fire an employee "to encourage or discourage membership in any labor organization."  29 U.S.C. § 158(a)(3).  When the NLRB's General Counsel brings regulatory enforcement proceedings to contest an employee's termination for union activity, the General Counsel bears the initial burden of showing "that the employee's protected conduct was a substantial or motivating factor" for the employee's discharge.  NLRB v. Transportation Management Corp., 462 U.S. 393, 401 (1983) abrogated in part and clarified by Director, Office of Workers' Compensation Programs v. Maher Terminals, Inc., 512 U.S. 267, 276-78 (1994).  The General Counsel satisfies this burden by showing: (1) that the employee engaged in protected activity; (2) that the employer was aware of the employee's protected activity; (3)  that the employer had animus against such activity; and (4) a causal connection between the employer's animus and the employee's termination.  See id. at 401-03; E.C. Waste, Inc. v. NLRB, 359 F.3d 36, 42 (1st Cir. 2004).  The General Counsel does not have to show that the employee's protected union activity "was the sole factor" for the discharge.  NLRB v. Hospital San Pablo, Inc., 207 F.3d 67, 70 (1st Cir. 2000).

-7-

If the General Counsel meets this burden -- and by so doing establishes a "prima facie case" that the employee was fired illegally -- the employer can defeat liability only by proving that "it would have taken the same action in the absence of the protected activity." E.C. Waste, 359 F.3d at 42. But the Board "does not have to accept" even "a seemingly plausible explanation" from the employer. Id. "If the Board supportably finds that the reasons advanced by the employer are either insufficient or pretextual, the violation is deemed proven." Id. The employer then has limited recourse in this court. We are bound by all of the Board's factual findings "as long as those findings are supported by substantial evidence." Id. And we are especially reluctant to question any credibility judgments made in the regulatory setting. Id.[2]

Despite the Board's findings, Holsum continues to argue that its termination of Torres was permissible. Holsum alleges two errors by the Board. The company contends that there was no substantial evidence that it knew about Torres's protected activity, and that it would have fired Torres for allowing a

---

[2] In proceedings like this one, the administrative law judge, the person who hears testimony and sees the witnesses, makes the credibility judgments. See 29 C.F.R. §§ 102.34-102.35. A party that disagrees with the judge's findings may file "exceptions." See 29 C.F.R. § 102.46. The Board then determines whether the excepted-to findings should be modified or adopted. The Board normally accomplishes such a review on the paper record, but it has the power to reopen the record and to hold hearings. See 29 C.F.R. §§ 102.48-102.50.

stranger to ride in his truck even if Torres had not engaged in any protected activity.

## A. Holsum's Knowledge of Torres's Union Activity

We are unconvinced by Holsum's contention that substantial evidence did not establish the company's awareness of Torres's efforts on behalf of the union. The company criticizes the administrative law judge for inferring that a Hoslum supervisor, who on one occasion observed Torres standing in the company parking lot for about fifteen minutes, had personally observed Torres's efforts to recruit other employees for the union. As Holsum points out, there is no evidence that Torres actually encouraged any other employees to join the union during these minutes. Still, as the Board found, there would have been many other occasions when Holsum personnel could have observed Torres's recruitment efforts. In the administrative law judge's words, Torres "conducted his union activities, including his solicitation and distribution of union cards to other employees, out in the open in [Holsum]'s parking lot, in plain view of those entering or leaving [Holsum]'s facility. His activities, therefore, could very well have been observed by any number of supervisors and managers . . .." In short, Torres was a visible and vocal leader in a unionization effort that the company was monitoring and stridently opposing.

We have allowed the Board to infer knowledge of protected

activity from no more than this. In Hosp. San Pablo, the Board found that an employer had knowledge of the union affiliation of an employee who had:

> started distributing cards to other employees in the Hospital's stairways, bathrooms, empty rooms, and machine rooms, but not in plain sight of the supervisors[,] gave out cards at the entrance to the Hospital at the start of work and in the parking lot at lunch, and [] met with employees to discuss the union, both at the Hospital and away. Some meetings were held near the cafeteria, close to the Hospital administration office . . ..

207 F.3d at 71. We said that the Board could find that the employer had knowledge of the employee's protected activity, even though there was no direct evidence that supervisors actually observed the activity. We noted:

> At a minimum, [the terminated employee] was a committed union activist and actually solicited co-workers at the Hospital, and it is reasonable to believe that someone dropped a hint, if not more, to management. Human nature is not to the contrary. Cf. NLRB v. Magnesium Casting Co., 668 F.2d 13, 16 (1st Cir. 1981). Direct evidence of an employer's knowledge of an employee's union activity is not needed; inferences may be used to establish the knowledge. See [NLRB v.] South Shore Hosp. 571 F.2d [677,] 683 [(1st Cir. 1977)] ("It is now well established that such knowledge need not be based on direct personal observation, but can be inferred from the facts and circumstances involved.").

Id. at 74. Here, it is equally clear that the Board could infer

-10-

Holsum's knowledge of Torres's protected activity from the facts in the record.

## B. Pretext

We are also unswayed by Holsum's contention that there was insufficient evidence to find that its stated reason for firing Torres was pretext. Holsum's argument relies on its assertion that the company had a "one strike and you're out" policy for violations of its "no-helper" rule, and that Torres would have been fired pursuant to this rule even if he had not been involved with the union. The Board simply did not believe either half of this argument, which was presented through the testimony of Holsum supervisors. Rather, the Board adopted the administrative law judge's conclusion that "no credible evidence was presented by [Holsum] to show that it ever had a 'one strike, you're out' rule" for "violations of the no-helper policy," and that if Torres had not been a union sympathizer he "at most, would only have received either a warning or a suspension" for the incident with the unwanted passenger. We describe briefly why the Board's conclusions have sufficient support in the record.

First, there were reasons for the Board to disbelieve testimony that there was a "one strike" policy for unauthorized transport of passengers. In attacking this credibility judgment, Holsum focuses on evidence suggesting that the company had terminated other employees for violating the no-helper rule. But

-11-

there was no evidence that the previously-terminated employees were similarly situated to Torres -- for example that they had committed only a single violation of the policy.  On the other hand, there was a documented case in which a Holsum salesman had driven around all day in his company truck with his cousin as an unauthorized passenger, but that employee was <u>not</u> fired.  There was also evidence that the company had informed supervisors and employees that a warning could be given for violations of the no-helper policy.

Second, there was also evidentiary support for the Board's expressed doubts that Torres's brief, unwanted transport of his uninvited passenger would have been grounds for termination if Torres had not been a union leader.  There was no evidence that any previously-terminated employee had been guilty of such an insubstantial violation of the policy against unauthorized passengers.  And there was no showing that the no-helper policy was so inflexible as to force an employee to stop his truck in the middle of an intersection and physically accost an intruder.

Third, there was additional evidence from which the Board permissibly could infer that the company's true motivation for firing Torres was his union activity.  The company capitalized on Torres's termination as an opportunity to intimate to Santiago that Torres had been fired as retaliation for his union leadership. The company also intensified its anti-union activities in the days

after Torres's firing, plausibly indicating that the effort to oust Torres was part of a concerted push to end the unionization drive. Finally, the company terminated Santiago only weeks after Torres's discharge, plausibly indicating that the company had decided in the spring of 2003 to rid its workforce of union enthusiasts. Given all of this evidence, we cannot say that there was insufficient support for the Board's conclusions that Holsum's stated reason for firing Torres was pretextual, and that Torres's protected conduct was a substantial or motivating factor in his discharge.

### III.

Holsum's petition for review is denied. The Board's cross-petition for enforcement is granted.

**So ordered.**