# United States Court of Appeals
## For the First Circuit

No. 06-2277

HOSPITAL CRISTO REDENTOR, INC.
d/b/a Hospital Cristo Redentor,

Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

Before

Lynch, Lipez, and Howard,
<u>Circuit Judges</u>.

<u>José A. Oliveras-González</u> for petitioner.
<u>Stacy Garrick Zimmerman</u>, Attorney, National Labor Relations Board, with whom <u>David Habenstreit</u>, Supervisory Attorney, <u>Ronald Meisburg</u>, General Counsel, <u>John E. Higgins, Jr.</u>, Deputy General Counsel, <u>John H. Ferguson</u>, Associate General Counsel, and <u>Aileen A. Armstrong</u>, Deputy Associate General Counsel, National Labor Relations Board, were on brief, for respondent.

May 30, 2007

**LYNCH**, **Circuit Judge**.  Hospital Cristo Redentor of Puerto Rico petitions for review of a decision and order of the National Labor Relations Board; the Board has filed a cross-application to enforce the order.

While the outcome of the case is largely driven by the facts and by the substantial evidence rule, there is one basic point of law worth stressing.  This court has previously rejected, and we do so again, arguments by petitioners that because they supposedly have complied with Puerto Rico Law 80, P.R. Laws Ann. tit. 29, §§ 185a-185m, they have a defense against enforcement of a Board unfair labor practice decision and order.  Such arguments fundamentally misunderstand both the operation of federal labor relations law and the role of courts reviewing Board orders.

The Board's July 31, 2006 decision and order affirmed an Administrative Law Judge's decision that the Hospital had violated the National Labor Relations Act, 29 U.S.C. §§ 151-169, as to its employee and union delegate Carlos Garcia Santiago ("Garcia").  The Hospital did so by: (1) interrogating Garcia about his union activities and threatening him in relation to those activities, in violation of section 8(a)(1) of the Act; and (2) both suspending and discharging Garcia for his union activities in violation of section 8(a)(3) and section 8(a)(1) of the Act.  Hosp. Cristo Redentor, Inc., 347 N.L.R.B. No. 65, at 1 (July 31, 2006).  The Board's remedy consisted of a cease-and-desist order, posting of

the remedial order, and full reinstatement of Garcia, with make-whole compensation and removal of all references to the unlawful suspension and discharge from the Hospital's files.  Id. at 6, 25.

We have jurisdiction to review the Board's final order. 29 U.S.C. § 160(e)-(f).

I.

With one exception related to the interplay between Law 80 and the NLRA, discussed later, the Hospital does not contend that the Board utilized incorrect legal standards.  We outline the basic federal labor laws at issue, and then discuss the evidence within that context.

Section 7 of the NLRA guarantees employees the right to organize.  Id. § 157.  It provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."  Id.  Section 8(a)(1) of the Act implements the guarantees in section 7 of the Act.  Id. § 158(a)(1).  Section 8(a)(1) provides: "It shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of" their section 7 rights.  Id.

Employers violate section 8(a)(1) of the Act by, inter alia, "coercively interrogating employees about their union

-3-

activities or sentiments, or about the activities or sentiments of others, and by either directly or indirectly threatening employees." NLRB v. Horizons Hotel Corp., 49 F.3d 795, 804 (1st Cir. 1995) (quoting 3-E Co. v. NLRB, 26 F.3d 1, 3 (1st Cir. 1994)) (internal quotation marks omitted). The Board determines whether there is coercive interrogation by looking to whether, under all of the circumstances, the interrogation reasonably tends to interfere with, restrain, or coerce the exercise of rights guaranteed by the Act. Rossmore House, 269 N.L.R.B. 1176, 1177 (1984), aff'd sub nom. Hotel Employees & Rest. Employees Union, Local 11 v. NLRB, 760 F.2d 1006 (9th Cir. 1985); accord 3-E Co., 26 F.3d at 3. "It is the coercive tendency of employer statements, not their actual effect, that constitutes a violation of the Act." Horizons Hotel Corp., 49 F.3d at 804 (alteration omitted) (emphasis added) (quoting NLRB v. Marine Optical, Inc., 671 F.2d 11, 18 (1st Cir. 1982)) (internal quotation marks omitted). The Board's finding of "coercive tendency" will not be disturbed if the finding is reasonable, even if the evidence is also susceptible to an alternative interpretation. Id.

Like section 8(a)(1) of the Act, section 8(a)(3) defines an unfair labor practice. 29 U.S.C. § 158(a)(3). An employer violates section 8(a)(3), as well as section 8(a)(1), by

-4-

discharging an employee for engaging in union activities.[1] Holsum de P.R., Inc. v. NLRB, 456 F.3d 265, 269 (1st Cir. 2006). Resolving an alleged section 8(a)(3) violation thus requires an inquiry into the employer's motives. In NLRB v. Transportation Management Corp., 462 U.S. 393 (1983), the Supreme Court set forth the test for determining whether an employer has an unlawful motive. Id. at 395, 404. The Transportation Management Court adopted the test announced by the Board in Wright Line, 251 N.L.R.B. 1083, 1089 (1980), enforced on other grounds, 662 F.2d 899 (1st Cir. 1981). Under the Wright Line test, the Board's General Counsel must first demonstrate that "the employee's protected conduct was a substantial or motivating factor in the adverse action." Transp. Mgmt., 462 U.S. at 401; accord Holsum, 456 F.3d at 269. The General Counsel is not required to demonstrate that the employee's protected union activity was the sole factor for the discharge. Holsum, 456 F.3d at 269; accord NLRB v. Hosp. San Pablo, Inc., 207 F.3d 67, 70 (1st Cir. 2000).

Once the General Counsel has made the showing that union animus was a motivating factor in the adverse employment action,

---

[1] Section 8(a)(3) of the Act makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to . . . discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). A violation of section 8(a)(3) of the Act necessarily interferes with the exercise of statutory rights, and therefore derivatively violates section 8(a)(1) of the Act. See Metro. Edison Co. v. NLRB, 460 U.S. 693, 698 n.4 (1983).

-5-

the employer must prove, as an affirmative defense, that it would have taken the same action even in the absence of the employee's protected activity. Transp. Mgmt., 462 U.S. at 400-03; Holsum, 456 F.3d at 269. Even if the employer proffers a "seemingly plausible explanation," the Board need not accept such an explanation at face value. E.C. Waste, Inc. v. NLRB, 359 F.3d 36, 42 (1st Cir. 2004). Rather, "[i]f the Board supportably finds that the reasons advanced by the employer are either insufficient or pretextual, the violation is deemed proven." Holsum, 456 F.3d at 269 (quoting E.C. Waste, 359 F.3d at 42) (internal quotation marks omitted); accord Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R. v. NLRB, 414 F.3d 158, 161 (1st Cir. 2005).

Because an employer rarely admits unlawful discrimination, the Board may determine motive by relying on circumstantial evidence and inferences reasonably drawn from the totality of the evidence. E.C. Waste, 359 F.3d at 42; see also NLRB v. Link-Belt Co., 311 U.S. 584, 602 (1941). Among the factors the Board often considers in assessing the unlawfulness of an employer's motive are the timing of the adverse action in relation to the union activity, the employer's hostility toward union activity, and the employer's reliance on pretextual justifications. See, e.g., E.C. Waste, 359 F.3d at 42 (timing); id. at 43 (deep-seated hostility toward union activity); Hosp. San Pablo, 207 F.3d at 73-74 (pretext).

-6-

The Board's factual findings, including findings of unlawful motive and inferences from the facts, are binding on this court if supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e)-(f); E.C. Waste, 359 F.3d at 42; McGaw of P.R., Inc. v. NLRB, 135 F.3d 1, 7 (1st Cir. 1997); see also NLRB v. S.E. Nichols, Inc., 862 F.2d 952, 956 (2d Cir. 1988) ("[I]n cases where difficult issues regarding employer motivation are of primary concern, the Act vests primary responsibility in the Board to resolve these critical issues of fact."). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Hosp. San Pablo, 207 F.3d at 70 (alteration in original) (quoting Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 523 (1981)) (internal quotation marks omitted).

We turn to the question of whether the Hospital has met its burden of showing that the Board's conclusions that the Hospital engaged in unfair labor practices are not supported by substantial evidence on the record as a whole. In that context we describe the pertinent facts.

## II.

The Board sustained the ALJ's findings that the Hospital had threatened and disciplined Garcia for his union activities. Hosp. Cristo Redentor, 347 N.L.R.B. No. 65, at 1. There is

-7-

adequate support in the record for those findings and conclusions. We summarize the record; more details are to be found in the Board's decision, 347 N.L.R.B. No. 65.

Garcia started working as a registered nurse at the Hospital in February 1995.[2] After a 1998 election, the Board certified a union to be the exclusive bargaining representative for a unit of registered nurses. Negotiations for a collective bargaining agreement started in November 1998. In January 1999, Garcia became the union delegate for the unit employees in the emergency room. In the meantime, the relationship between the Hospital and the union grew fractious. The union filed an unfair labor practice charge in April 1999. Over the next fifteen months, the union filed several additional unfair labor practice charges against the Hospital. The General Counsel issued a number of complaints.

After Garcia became a delegate, he received, for the first time, a written warning from his supervisor, Osvaldo Rivera David ("Rivera"). It warned Garcia that he needed to improve his attitude. Thereafter, Garcia received a series of disciplinary warnings about his attitude. In a letter to Garcia, Rivera stated that Garcia's "attitude problems" consisted of Garcia's expressing

---

[2] Garcia began work at the Guayama Area Hospital. In June 1998, the Hospital was privatized and became the Hospital Cristo Redentor, Inc.

dissatisfaction with some hospital working conditions and policies and making complaints about inequitable shift allotments and favoritism by management in front of patients and visitors.

On July 7, 2000, Human Resources Director Ivette Lacot Ramos ("Lacot") and others met with Garcia and a union representative about Garcia's "attitude problems." On July 27, 2000, Lacot issued Garcia a written warning. The warning acknowledged Garcia's "competence as a professional" but warned him to stop making complaints about working conditions in front of co-workers, patients, and visitors, particularly because he acted as a "leader."

After a disagreement in March 2001 about whether Garcia had failed to comply with medical records protocols when he wrote in a correction over a mistake on a patient's chart, Rivera again issued a warning to Garcia about his attitude problems. Management met with Garcia and various union representatives on March 29 to discuss the incident.

After accusations of other alleged improprieties, which were denied by Garcia, Lacot issued Garcia a "formal admonishment," which purported to memorialize the March 29 meeting, noted the subsequent alleged incidents, and again requested that Garcia "improve [his] attitude." The admonishment acknowledged that Garcia had said he was feeling persecuted because he was a union delegate.

-9-

Eventually Garcia was suspended on May 11, 2001 for alleged misconduct on April 23. On April 23, Garcia had been responsible for the key to the emergency room narcotics cabinet, which was kept locked at all times. The emergency room was understaffed, and when no nurses were available to take patient samples to the laboratory for analysis, Garcia twice left the emergency room, with the narcotics key, to take samples to the lab. During both of Garcia's trips to the lab, a patient began convulsing in the emergency room; both times, Garcia's absence caused a delay in administering a drug to the patient. Later during the same shift, Garcia used the emergency room loudspeaker to call on his coworkers to assist him. The Hospital alleged that Garcia had announced over the loudspeaker that "there [was] a lot of work, that [he was] the only one who was working[,] and [that] nobody was helping [him]." Garcia disputed that he had insulted his coworkers.

Garcia was discharged from employment on October 19, 2001. The discharge came after an incident on October 6 in which Garcia had left the Hospital to attend to a medical emergency of a family member. The Hospital claimed that Garcia had not received his supervisor's permission before leaving. The Hospital also alleged that on October 18, Garcia had made inappropriate statements suggesting a suicide attempt to a mother when her

-10-

daughter was admitted to the emergency room after having taken five Panadol PM tablets and fainted at school.

III.

A.          Substantial Evidence Analysis

1.   Whether the General Counsel Met His Burden

On petition for review, the Hospital appears to argue that the General Counsel failed to meet his burden under Wright Line on the alleged violations.[3]  The record makes it easy to conclude that the burden was met.  There were several smoking guns indicating that the Hospital both had anti-union animus and had retaliated against Garcia for his role in the union.

Indeed, there was an explicit conversation between management and Garcia in which Garcia was told that his lot in life would improve if he abandoned his union activities.  The general supervisor of nursing services, Ausberto Felix Ortiz ("Felix"), point-blank asked Garcia if he was going to engage in union protest activity on August 6, 2001.  When Garcia said that he was, Felix replied that that was why Garcia would never be a supervisor and why he was "always in trouble."  After a pregnant pause, Felix then made a comment associating the union -- and Garcia by implication

---

[3]     The Board expressly noted that the Hospital had not contested the ALJ's determination that Garcia's union activity was a motivating factor in the suspension decision.  Hosp. Cristo Redentor, 347 N.L.R.B. No. 65, at 4.  We read the Hospital's pleadings to the Board somewhat more charitably.

-- with a Satanic sect. The ALJ found Felix's denial of the conversation not credible.

The Hospital argues that the ALJ improperly based his credibility determination on the plausibility of Felix's assertion that he had no interest in union affairs. The ALJ noted that Felix "carried significant responsibility for providing adequate nursing staff during union picketing," and that Felix conceded that he undertook necessary preparations before each union strike. Hosp. Cristo Redentor, 347 N.L.R.B. No. 65, at 17. This court will set aside an ALJ's credibility finding "only when [the ALJ] oversteps the bounds of reason." Holyoke Visiting Nurses Ass'n v. NLRB, 11 F.3d 302, 308 (1st Cir. 1993) (quoting NLRB v. Am. Spring Bed Mfg. Co., 670 F.2d 1236, 1242 (1st Cir. 1982)) (internal quotation marks omitted). It was certainly not unreasonable for the ALJ to conclude that a supervisor charged with ensuring adequate nursing coverage during union strikes would have at least some interest in that union activity, and that Felix's denial of any such interest was not credible. Moreover, the ALJ buttressed his conclusion with his observation of "Felix's haughty demeanor on the witness stand." Hosp. Cristo Redentor, 347 N.L.R.B. No. 65, at 18. Credibility assessments by the ALJ, in particular, are entitled to great weight, "since he heard and saw the witnesses testify." McGaw, 135 F.3d at 7 (quoting Holyoke Visiting Nurses Ass'n, 11 F.3d at 308)

(internal quotation marks omitted); accord Hosp. San Pablo, 207 F.3d at 70.

There was additional evidence of anti-union animus. In September 2001, Garcia was called in for a disciplinary meeting; the Hospital had apparently prepared a letter dismissing Garcia for a supposed incident on a particular date. The Hospital had neglected to look at its own records, which, when produced at the union's insistence, showed that Garcia had not been on duty on the day of the alleged incident. Management's trumping up charges to dismiss a union representative is hardly evidence of neutrality.

Further, Ingrid Vega Méndez, a union representative who attended the September meeting, testified that Lacot, the human resources director, said after the meeting that Garcia's attitude could not be tolerated "and that [it] could bring about his dismissal, and, even more so, when he was the delegate." Lacot's comment directly ties management's actions to Garcia's role as a union delegate. The Board thus had unusually strong evidence that Garcia's union activity was a "substantial or motivating factor" in the actions taken against him.

### 2. Whether the Hospital Met Its Burden

The Hospital also argues that even if the General Counsel met his burden under Wright Line, substantial evidence does not support the Board's conclusion that the Hospital had not met its burden of showing it would have suspended Garcia and later

terminated his employment in the absence of his union activity.[4] The Hospital argued to the Board that two incidents would have led to the suspension even if Garcia had not been a union delegate: Garcia's absence from the emergency room with the narcotics key and Garcia's making an announcement deemed inappropriate by the Hospital over the emergency room loudspeaker.

The Board justifiably found that the Hospital had not met its burden and that the true reason for suspending Garcia was Garcia's union activity.[5] As the Board noted, the Human Resources Director herself referred to the narcotics-key incident as a "minor offense" and testified that she had not disciplined Garcia for it. Hosp. Cristo Redentor, 347 N.L.R.B. No. 65, at 4. There also was evidence that other employees had similarly left the emergency room with the narcotics key, but no evidence that they had been similarly disciplined. As both the ALJ and the Board stated, Garcia was faced with a Hobson's choice among several undesirable alternatives when he left with the key in order to take patient

_____

[4]    The Hospital's arguments are primarily focused on Garcia's dismissal. Giving the Hospital the benefit of the doubt, we also review the Board's finding that Garcia's suspension also constituted an unfair labor practice. To the extent the Hospital challenges the Board's finding that Garcia was interrogated and threatened because of his union membership, Felix's remarks to Garcia more than adequately support the finding of an unfair labor practice.

[5]    One member of the Board would have revised the ALJ's finding on the suspension, but joined in adopting the findings of violations as to the interrogation, threats, and discharge. Hosp. Cristo Redentor, 347 N.L.R.B. No. 65, at 6.

samples to the lab when no one else was able to do so.  <u>Id.</u> at 4, 23.

The Hospital contends that Garcia should have left the narcotics key in the emergency room when he went to the lab.  That may be so, and it may even have been reasonable for the Hospital to treat the incident as a serious one.  But the evidence in the record indicates that the Hospital <u>did not</u> treat such incidents as serious infractions.  The issue is not whether Garcia should have handled the situation differently.

As for the loudspeaker episode, the ALJ characterized the announcement as a brief outburst by a frustrated Garcia, who was using undiplomatic means to get more staffing assistance in a severely understaffed emergency room.  <u>Id.</u> at 22-23.  As the ALJ and the Board indicated, the record is devoid of evidence, save for the suspension letter itself, that Garcia actually made objectionable remarks over the loudspeaker.  <u>Id.</u> at 5, 23.  Even assuming that the Hospital's characterization of the episode is correct, the record does not show that Garcia would have been suspended absent his union activities. The suspension letter notes that the loudspeaker incident was the third time that there had been a problem with Garcia's attitude, and that because the "available corrective measures" had been exhausted, Garcia was

being suspended.[6]  However, at least one of the prior two incidents involved union-related activities.  The Board's conclusion that the Hospital would not have suspended Garcia save for his union activities is thus supported by substantial evidence.

The Board also supportably found that the Hospital had not met its burden of showing it would have terminated Garcia's employment regardless of union activity.  The Hospital's termination letter gave three reasons for discharging Garcia: the October 6 incident in which he left the hospital to attend to a family emergency, the incidents resulting in his suspension, and the improper diagnosis of a patient on October 18.  Our earlier holding that substantial evidence supports the Board's findings as to the incidents resulting in Garcia's suspension eliminate them as a legitimate basis for termination.

As the ALJ recognized, the evidence indicates that Garcia spoke with his supervisor before leaving the Hospital on October 6. Id. at 15-16.  The supervisor's testimony indicated that she understood that Garcia had an emergency and needed to leave the Hospital, and that after she was unable to find the appropriate authorization form, she accepted instead a note from Garcia explaining his reason for leaving.

---

[6]    The letter also noted a problem with absenteeism for which Garcia was reprimanded in April 1999.  The letter indicated, however, that Garcia had "corrected" this problem.  Under the Hospital's policy, then, it was not a valid basis for the suspension.

-16-

Likewise, the ALJ's finding that the October 18 incident did not warrant dismissal is supported by the record. On October 18, 2001, a young girl arrived at the emergency room after having fainted. The Hospital claims that Garcia told the girl's mother that the girl likely had tried to commit suicide. In fact, the girl had taken several Panadol tablets for a headache from having not eaten and had then fainted because she had not had enough to eat. In the termination letter, this episode was characterized as a breach of the Hospital's privacy and confidentiality policy. As the ALJ indicated, there is no evidence that Garcia revealed confidential information. Id. at 23.

The Hospital has now recharacterized the violation as more general "improper handling of patient care." Regardless, the only evidence in the record is that Garcia assumed based on the information provided to him that the girl had attempted to commit suicide, and that in informing the mother of the procedures that her daughter would undergo, Garcia indicated that if necessary the daughter would be subject to the protocol for dealing with cases of attempted suicide. There is no evidence to support the Hospital's suggestion that Garcia diagnosed the patient, and in fact Garcia directly denied having done so and indicated that he had told the mother that the physician would be the one to make the diagnosis.

The Hospital also presents an after-the-fact justification for the suspension and discharge. It now says that

-17-

the suspension and discharge were justified by an admitted medical records mistake by Garcia. On March 12, 2001, Garcia made a mistake recording a medication dosage onto a patient's chart. When he corrected the mistake, he deviated from Hospital protocol, which required him to strike through the erroneous order, write "Omit," and initial and date the strike-through before noting the correct order. Instead, Garcia simply wrote the correct order on top of the incorrect order.

The Hospital characterizes the episode as an attempt to evade responsibility for a <u>medical</u> mistake, in which the incorrect dosage actually was administered to the patient.[7] The record does not support such an argument. As the ALJ noted, the correct dosage was written over the incorrect dosage without any apparent attempt to conceal the change. Moreover, this error in correcting a record was not a reason proffered by the Hospital in either the suspension letter or the termination letter. The Hospital's volte face on the grounds for suspension and termination undermines its argument. <u>See</u> <u>E.C. Waste</u>, 359 F.3d at 44 ("[A]n employer's shifting explanations for discharging an employee may themselves serve either to ground or to reinforce a finding of pretext."); <u>see</u> <u>also</u> <u>Santiago-Ramos</u> v. <u>Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 56

---

[7] Although Garcia denied that any medication was incorrectly administered, the ALJ found that such an error had been made by a trainee nurse for whom Garcia ultimately was responsible. <u>Hosp. Cristo Redentor</u>, 347 N.L.R.B. No. 65, at 13.

(1st Cir. 2000). The ALJ was justified in finding that the recording error was at most a minor records protocol error that did not justify suspension or dismissal.

The sum, it is true, may be greater than the total of its parts. A series of incidents none of which individually would warrant dismissal in total may nonetheless justify it. But that argument cannot plausibly be made by the Hospital here. The after-the-fact justification offered by the Hospital only further supports the Board's conclusion that the Hospital's proffered reasons for the suspension and discharge were pretext.

The Board's finding that the Hospital engaged in unfair labor practices is supported by substantial evidence.

B.       Puerto Rico Law 80

The Hospital argues, from its view of the facts, that it had "just cause" under Puerto Rico Law 80 to dismiss Garcia for flagrant offenses, and so it cannot have violated the NLRA. The Hospital urges us to look to Law 80 in determining whether an employer suspended or discharged an employee "for cause,"[8] 29 U.S.C. § 160(c), and argues that its supposed compliance with Law 80 satisfies its burden under Wright Line. The Hospital made this argument to the Board, but the Board did not discuss it, presumably

_____

    [8]    Because the Hospital expressly concedes that federal law governs, we do not discuss the NLRA's preemption of inconsistent state law. See, e.g., Building & Constr. Trades Council v. Assoc. Builders & Contractors of Mass./R.I., Inc., 507 U.S. 218, 224 (1993).

because it found that Garcia was suspended and discharged because of his union activities.

We discuss the issue simply to emphasize that any employer argument that a Board order may not be enforced because the employer has arguably complied with Law 80 necessarily fails for a series of reasons. The Hospital misperceives both the effect of local law and the limited role of judicial review of Board decisions.

Section 10(c) of the NLRA states, in relevant part: "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." 29 U.S.C. § 160(c). There is no reason whatsoever to think that Congress, in setting uniform national standards governing labor relations, intended section 10(c) to incorporate laws such as Puerto Rico Law 80. Cf. NLRB v. E. Mass. St. Ry. Co., 235 F.2d 700, 709 (1st Cir. 1956) (noting the development by the Board of a section 10(c) "for cause" body of case law).

Indeed, we have consistently held that purported compliance with Law 80 does not preclude a finding of an unfair labor practice. We have rejected claims that Law 80 requires (or at least permits) layoffs on the basis of seniority, and that this provides a defense to an allegation of an unfair labor practice.

See, e.g., McGaw, 135 F.3d at 9-11. In E.C. Waste, we rejected a claim based on the effect of Law 80 on a period of probation. 359 F.3d at 43-44.

Nor, as a matter of Puerto Rico law, is Law 80 itself intended to serve as a defense to an unfair labor practice charge. As we noted in Rodriguez v. Eastern Air Lines, Inc., 816 F.2d 24 (1st Cir. 1987), Law 80 "was intended to increase protection for dismissed workers." Id. at 27. The Guidelines for the Interpretation and Application of Law 80 (May 30, 1976) ("Guidelines"), promulgated by the Puerto Rico Department of Labor and Human Resources, indicate that Law 80 was not meant to interfere with the enforcement of the NLRA. The Guidelines are clear that "if [a] dismissal of an employee turns out to be an illegal work practice, the applicable law is the Puerto Rico Labor Relations Act or the National Labor Relations Act, as the case may be." McGaw, 135 F.3d at 10-11 (alteration in original) (quoting Guidelines at 11) (internal quotation marks omitted). Moreover, the Hospital's argument requires an inversion of logic. As we said in McGaw, it "would be perverse indeed to allow [the employer] now to invoke a statute enacted for the protection of workers as a justification for its unlawful labor practices." Id. at 10.

The Hospital also misunderstands a basic principle of judicial review in invoking Law 80 as a defense to enforcement of the Board's order. It is the ALJ and the Board who are the finders

-21-

of fact; Law 80 does not change that.  The ALJ's and the Board's factual determinations must be upheld if based on substantial evidence.  E.g., E.C. Waste, 359 F.3d at 42.  The Board has supportably found that Garcia was suspended and discharged because of his union activities, not because of any deficiency in his performance of his duties.  Hosp. Cristo Redentor, 347 N.L.R.B. No. 65, at 1.

We deny the Hospital's petition for review and grant enforcement of the Board's order.  Costs are awarded to the Board.